**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| In re: | : | **Chapter 11** |
| | : | |
| **DAN LEPORE & SONS COMPANY,**[1] | : | **Case No. 25-14757 (AMC)** |
| | : | |
| Debtor. | : | |
| | : | |
| **DAN LEPORE & SONS COMPANY,** | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | **ADVERSARY NO. 26-** |
| | : | |
| **CVM CONSTRUCTION** | : | |
| **MANAGERS, INC.  D/B/A** | : | |
| **CVMNEXT CONSTRUCTION,** | : | |
| | : | |
| Defendant. | : | |
| | : | |

**COMPLAINT OF DEBTOR TO COMPEL**
**TURNOVER OF ESTATE PROPERTY PURSUANT TO**
**11 U.S.C. §§ 541 AND 542 AND FOR OTHER RELATED RELIEF**

Dan Lepore & Sons Company (the "Debtor" or the "Plaintiff") brings this adversary proceeding, pursuant to 11 U.S.C. §§ 105, 541 and 542 and Fed. R. Bankr. P. 7001, to compel turnover of property of the estate and other related relief and respectfully alleges as follows:

**JURISDICTION AND VENUE**

1.      This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334(b) and 28 U.S.C. § 157(a), which is a civil proceeding arising under or arising in or related to a case under title 11 of the United States Code (the "Bankruptcy Code").

2.      This is a core proceeding as defined by 28 U.S.C. § 157(b)(2)(A), (E), and (O).

---

[1] The last four digits of the Debtor's federal tax identification number are (3562). The Debtor has an address at 501 Washington Street, Conshohocken, PA 19428.

3.      Venue of the Debtor's bankruptcy case and this adversary proceeding is properly in the United States Bankruptcy Court for the Eastern District of Pennsylvania pursuant to 28 U.S.C. §§ 1408 and 1409(a).

4.      This adversary proceeding is commenced pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure.  By this adversary proceeding, the Debtor seeks to compel turnover of property of the estate pursuant to Sections 105, 541 and 542 of the Bankruptcy Code and other related relief.

## PARTIES AND FACTUAL BACKGROUND

A.      *The Parties and the Chapter 11 Filing*

5.      Plaintiff is the Debtor, Dan Lepore & Sons Company.

6.      CVM Construction Managers, Inc. d/b/a CVMNEXT Construction ("CVMNEXT," or the "Defendant") is a Pennsylvania corporation with a principal business address of 1002 West 9th Avenue, King of Prussia, Pennsylvania 19406.

7.      On November 21, 2025 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of Pennsylvania.

8.      The Debtor continues in the management and operation of its business and property as a debtor-in-possession.

B.      *The Subcontract and the Continuing Issues on the Arch Street Spire Project; Defendant's Delays*

9.      On or about December 11, 2024, Arch Street United Methodist Church (the "Owner") entered into a principal contract with CVMNEXT for the rehabilitation of the church's Arch Street spire.

10.     On or about January 7, 2025, CVMNEXT entered into the Subcontract with the

2

Debtor, in the amount of $1,359,000.00, as amended by net change orders to the amount of $1,313,872.00 (the "Subcontract"), to furnish labor, materials, equipment, and supervision for the performance of masonry work as more specifically described the Subcontract (the "Debtor's Work") for the project known as the Arch Street United Methodist Church Spire Rehabilitation (the "Arch Street Spire Project"). A true and correct copy of the Subcontract is attached hereto as Exhibit "A" and made a part hereof.

11.     Pursuant to the terms of the Subcontract, the Debtor's Work was scheduled to commence on March 1, 2025, and be substantially completed by December 1, 2025.

12.     However, per the Subcontract, in order for the Debtor to commence and execute the Debtor's Work, Defendant was contractually responsible to provide the necessary scaffolding and hoisting at the Arch Street Spire Project.

13.     Defendant's immediate, continuing and significant delays of over six (6) months to provide the necessary scaffolding and hoisting (a) disrupted the Debtor's ability to work at the Arch Street Spire Project, (b) triggered unnecessary remobilization costs, (c) caused the Arch Street Spire Project to lose its scheduled position in the mill for the requisite marble roll fabrication and production, and (d) disrupted the proper sequencing of the Debtor's Work.

14.     Once the Defendant finally completed its scaffolding in late September 2025, it began a series of inspections and surveys to establish Debtor's final scope of work quantities for the Arch Street Spire Project, including the requisite marble roll quantities, in the form of Site Observation Reports

15.     The Defendant utilized the Site Observation Reports prepared by Kevin S. Cole, Professional Engineer (PE), of CVM, an affiliate of the Defendant (the "CVM Engineer"), and accompanying documents to finalize Debtor's scope of work quantities and adjust Debtor's scope

of work.

16.     By way of example, the Defendant, by and through the CVM Engineer, identified an alleged deficiency regarding the Debtor's Work through Site Observation Reports Nos. 9 and 10 dated November 7, 2025 and November 12, 2025, respectively re: Trefoil Openings, wherein Defendant noted "that the joint at the top of the new brick backup is not fully set with mortar (figure 6)."

17.     In a prompt and timely response, Debtor examined *all* trefoil conditions and mortared each top joint trefoil conditions at the Arch Street Spire Project *before* November 25, 2025

18.     Indeed, the Debtor was required to update and adjust its scope of work quantities based on Defendant's Site Observation Reports as the spire elevations were sequentially inspected by the Defendant's engineers through Site Observation Report No. 11 dated November 25, 2025 ("SOR No. 11"). SOR No. 11 was the last Site Observation Report provided by Defendant to the Debtor regarding the Arch Site Spire Project.

19.     As referenced above, per the terms of the Subcontract, the Debtor only had two hundred seventy-five (275) calendar days to complete Debtor's Work on the Arch Street Spire Project starting on March 1, 2025 and to be substantially complete by December 1, 2025.  The marble rolls were the most critical and time-consuming scope of work line item on the Arch Street Spire Project.  Marble rolls are radial ribs on the corners of the faceted spire with each roll requiring time-consuming radial fabrication and finishing in a marble mill in New England.

20.     The Defendant's delayed scaffold completion postponed the commencement of the CVM Engineer's work by over six (6) months; these delays were further aggravated by the untimely work of the CVM Engineer which work was not completed until November 25, 2025

4

when SOR No. 11 was issued by Defendant to Debtor.

21.    Of significance, SOR No. 11 failed to finalize marble roll quantities based, in part, on Defendant failure to reply to Debtor's email inquiry requesting final marble roll quantities and, the Debtor's inquiry requesting the quantity and type of marble rolls desired by Defendant to cover unforeseen replacement to marble roll quantities.

22.    The Defendant's delays left the Debtor only six (6) days for completion of the Arch Street Spire Project before the contractual December 1st deadline and, as a result, the Debtor had less than a week to detail, procure, fabricate, deliver, unload, hoist and install all the marble rolls coming from a mill in New England.

23.    The Defendant's failure to fulfill its responsibilities under the Subcontract created delays that pushed the Arch Street Spire Project into the winter of 2025-2026 and beyond.

24.    Despite the Debtor's numerous requests, the Defendant has failed to provide a final quantity of marble rolls needed at each respective location at the Arch Street Spire Project (i.e. by elevation and course height) and/or how many additional marble rolls of each size should be added to these quantities to cover replacements that may had been unforeseen in Defendant's field observation reports.

25.    Consequently, the Debtor has been unable to confirm whether the final quantity of marble rolls needed to complete the Arch Street Spire Project is compatible with Debtor's approved schedule of values dated December 24, 2025 (the "SOV").   A true and correct copy of the SOV, together with the Debtor's December 24, 2025 transmittal e-mail to the Defendant is attached hereto as Exhibit "B" and made a part hereof.

26.    The Debtor's SOV and accompanying e-mail delivered on December 24, 2025, *inter alia*, requests the Defendant to confirm change order requests nos. 1 and 2 which adjust the

marble roll quantities.

27.    By reply e-mail dated December 24, 2025, the Defendant, by and through Don Scholz in his capacity as project manager, indicated that it would "issue the change orders the first week of January and will circle back with Greg [the Debtor's president]."

28.    Notwithstanding the foregoing, the Defendant has failed and continues to fail to approve and issue the requisite change orders nos. 1 and 2 so that the marble roll quantities can be finally reconciled for fabrication.

29.    Moreover, the Defendant's necessary hoisting is still not complete on the upper spire.

30.    The delays on the Arch Street Spire Project were exacerbated by Defendant's failure to respond or to provide timely responses to the Debtor's numerous requests seeking critical and time-sensitive information regarding the scaffold's ability to support material and equipment loads to ensure that Lepore could work safely and gainfully onsite.

31.    Despite Defendant's delays and failures under the Subcontract, the Debtor has provided all necessary labor, materials and equipment at the Arch Street Spire Project that was feasible under the challenging job site conditions.   As proof, the Defendant's SOR No. 11 does not identify *any deficiencies* in the Debtor's Work at the Arch Street Spire Project.   A true and correct copy of SOR No. 11 is attached as Exhibit "C" and made a part hereof.

C.    *Defendant's Unpaid Obligations under the Subcontract*

32.    Notwithstanding the above-referenced delays, sequencing and marble roll quantity issues, and failure to adequately respond to job-critical communications, prior to the Petition Date, the Debtor performed under the Subcontract and, in accordance therewith, furnished labor, materials and equipment to the Defendant at the Arch Street Spire Project.

33. Under the Subcontract, the Debtor submitted to Defendant three monthly payment applications on account of the Debtor's Work completed at the Arch Street Spire Project:

    a. Payment Application No. 1 (dated October 29, 2025) for the period ending October 31, 2025 in the amount of $174,915.08 which was approved ("Payment Application No. 1");

    b. Payment Application No. 2 (dated November 24, 2025) for the period ending November 30, 2025 in the amount of $102,529.80 which was approved ("Payment Application No. 2"); and

    c. Payment Application No. 3 (marked DRAFT) for the period ending December 31, 2025 in the amount of $34,108.20 which is pending approval ("Payment Application No. 3").

True and correct copies of Payment Application No. 2 and Payment Application No. 3 are attached as Exhibits "D" and "E," respectively, and made a part hereof.

34. The Subcontract provides, in relevant part that "[o]nce the payment application has been approved and submitted in accordance with Section 6 of the subcontract document, the [Defendant], within 14 days of receipt of each progress payment from the Owner, shall pay the [Debtor] for their application." *See* Exhibit A – Subcontract at Section 6, page 4.

35. Upon information and belief, the Owner has paid to the Defendant the amount of $102,529.80 on account of approved Payment Application No. 2 (dated November 24, 2025), but the Defendant is withholding turnover/payment of these monies due the Debtor.[2]

36. As of the filing of this Complaint, the Defendant has only remitted the sums due

---

[2] Upon Owner's approval of DRAFT Payment Application No.3 and payment to Defendant in the amount of $34,108.20 or otherwise, the Debtor is entitled to these funds; the Debtor reserves all rights to amend this complaint and to recover these additional proceeds.

the Debtor on account of Payment Application No. 1 in the amount of $174,915.08.

37.    Despite the Debtor's prior demands for turnover and payment of the additional sums due pursuant to Payment Application No. 2 in the amount of $102,529.80 (the "Unpaid Obligations"), including the Debtor's recent e-mails to Donald Scholz and Sameh Majid for the Defendant dated January 2, 2026 and January 26, 2026, the Defendant has failed to pay the Unpaid Obligations to the Debtor. True and correct copies of Debtor e-mail to Defendant dated January 2, 2026 and Debtor e-mail to Defendant dated January 26, 2026 are attached as Exhibits "F" and "G," respectively, and made a part hereof.

38.    Prior to the filing of this Complaint, the Debtor's counsel mailed a letter to the Defendant (the "Demand Letter") requesting that the Defendant turnover and pay the Unpaid Obligations to the Debtor.   The Demand Letter specifically reserved any and all rights in collection with the collection of the Unpaid Obligations and any additional amounts that are due or that may become due and owing by the Defendant.   A true and correct copy of the Demand Letter is attached hereto as Exhibit "H" and made a part hereof.

39.    As of the date of the filing of this Complaint, the Defendant has not responded to the Demand Letter and has failed to turn over and pay the Unpaid Obligations to the Debtor.

40.    The Declaration of the Greg J. Lepore, the Debtor's President, in Support of this Complaint is attached hereto as Exhibit "I" and made a part hereof.

## COUNT ONE

### (Turnover of Estate Property Under 11 U.S.C. § 542)

41.    The Trustee incorporates herein by reference the preceding paragraphs as if fully set forth herein at length.

42.     The Debtor furnished labor, materials and equipment to the Defendant at the Arch Street Spire Project for the benefit of the Defendant.

43.     Despite the Debtor's request for progress payments in accordance with the Subcontract, the Defendant has failed to pay the Debtor the Unpaid Obligations.

44.     The Unpaid Obligations are subject to turnover under Section 542 of the Bankruptcy Code because the Unpaid Obligations are property of the Debtor's estate, pursuant to Section 541 of the Bankruptcy Code. *See*, 11 U.S.C. § 541(a) ("The commencement of a case . . . creates an estate. Such estate is comprised of all of the following property, wherever located and by whomever held: (1) . . . all legal or equitable interests of the debtor in property as of the commencement of the case."). Property of the estate is also comprised of "[a]ny interest in property that the estate acquires after the commencement of the case." *See*, 11 U.S.C. § 541(a)(7).

45.     Section 542 of the Bankruptcy Code gives a trustee the power to seek turnover of all property of a debtor's estate. *See*, 11 U.S.C. § 542. Section 542 of the Bankruptcy Code states, in pertinent part, that:

> An entity, other than a custodian, in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease under section 363 of this title, or that the debtor may exempt under section 522 of this title, shall deliver to the trustee, and account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate.

*See*, 11 U.S.C. § 542.

46.     As set forth above, the Unpaid Obligations are property of the Debtor's estate because the Debtor held a legal and/or equitable interest in the Unpaid Obligations as of the Petition Date or acquired a legal and/or equitable interest in the Unpaid Obligations after the Petition Date.

47.     The Defendant remains is in possession, custody, and control of the Unpaid

Obligations.

48.    The Debtor may use or sell the Unpaid Obligations under Section 363 of the

Bankruptcy Code, and the receipt of such funds would aid the Debtor in the administration of this

Chapter 11 Case.

49.    The Unpaid Obligations are valuable and beneficial to the Debtor's estate.

50.    As such, the Debtor submits that the Defendant is obligated to turnover the

Unpaid Obligations in accordance with 11 U.S.C. § 542.

**WHEREFORE,** the Debtor seeks judgment against the Defendant:

(a)    for the Debtor and against the Defendant in the amount of $102,529.80 through
       November 30, 2025;

(b)    compelling the Defendant to turnover and deliver the Unpaid Obligations to the
       Debtor;

(c)    awarding pre- and post-judgment interest on the Unpaid Obligations;

(d)    awarding attorneys' fees and costs; and

(e)    for such other and further relief as this Court deems appropriate.

## COUNT TWO

### (Account Stated)

51.    The Debtor repeats and re-alleges the allegations contained in all the preceding

paragraphs of this Complaint as if the same were fully set forth herein at length.

52.    The total amount owed to the Debtor's estate by the Defendant as a result of the

Unpaid Obligations is $102,529.80.   *See*, Exhibit "D."

53.    The Unpaid Obligations are currently due and payable to the Debtor estate as stated

without offset.

54.    Despite request for payment, the Defendant has refused to pay the Unpaid

Obligations to the Debtor.

**WHEREFORE,** the Debtor seeks judgment against the Defendant:

(a)     for the Debtor and against the Defendant in the amount of $102,529.80 through November 30, 2025;

(b)     compelling the Defendant to turnover and deliver the Unpaid Obligations to the Debtor;

(c)     awarding pre- and post-judgment interest on the Unpaid Obligations;

(d)     awarding attorneys' fees and costs; and

(e)     for such other and further relief as this Court deems appropriate.

**COUNT THREE**

**(Breach of Contract)**

55.     The Debtor repeats and re-alleges the allegations contained in all the preceding paragraphs of this Complaint as if the same were fully set forth herein at length.

56.     The Debtor and the Defendant entered into the Subcontract whereby the Defendant would pay all amounts owed under said Subcontract.

57.     The total amount owing from the Defendant to the Debtor on account of Payment Application No. 2 is $102,529.80.   *See*, Exhibits "D."

58.     The Defendant has breached the Subcontract by failing to pay the Unpaid Obligations to the Debtor as and when required.

**WHEREFORE,** the Debtor seeks judgment against the Defendant:

(a)     for the Debtor and against the Defendant in the amount of $102,529.80 through November 30, 2025;

(b)     compelling the Defendant to turnover and deliver the Unpaid Obligations to the Debtor;

(c)     awarding pre- and post-judgment interest on the Unpaid Obligations;

(d)     awarding attorneys' fees and costs; and

(e)       for such other and further relief as this Court deems appropriate.

## COUNT FOUR

### **(Unjust Enrichment)**

59.     The Debtor repeats and re-alleges the allegations contained in all the preceding paragraphs of this Complaint as if the same were fully set forth herein at length.

60.     The Debtor furnished labor, materials and equipment to the Defendant at the Arch Street Spire Project for the benefit of the Defendant and the amount still owed by the Defendant totals $102,529.80 through November 30, 2025.

61.     The Defendant benefitted from the labor, materials and equipment provided by the Debtor and the costs extended by the Debtor.

62.     The Defendant has refused to make payment to the Debtor for the Unpaid Obligations.

63.     The Defendant has been unjustly enriched by the value of the labor, materials and equipment provided to the Defendant by the Debtor that the Defendant has not paid for (i.e., the Unpaid Obligations).

**WHEREFORE,** the Debtor seeks judgment against the Defendant:

(a)       for the Debtor and against the Defendant in the amount of $102,529.80 through November 30, 2025;

(b)       compelling the Defendant to turnover and deliver the Unpaid Obligations to the Debtor;

(c)       awarding pre- and post-judgment interest on the Unpaid Obligations;

(d)       awarding attorneys' fees and costs; and

(e)       for such other and further relief as this Court deems appropriate.

## COUNT FIVE

### (Detrimental Reliance)

64.    The Debtor repeats and re-alleges the allegations contained in all the preceding paragraphs of this Complaint as if the same were fully set forth herein at length.

65.    The Debtor furnished labor, materials and equipment to the Defendant at the Arch Street Spire Project to the Defendant and the amount still owed by the Defendant totals $102,529.80 through November 30, 2025.

66.    The Defendant benefitted from the labor, materials and equipment provided by the Debtor and the costs extended by the Debtor.

67.    The Defendant has refused to make payment to the Debtor for the Unpaid Obligations.

68.    The Debtor detrimentally relied on the Defendant's promise to pay for the labor, materials and equipment provided by the Debtor at the Arch Street Spire Project.

**WHEREFORE,** the Debtor seeks judgment against the Defendant:

(a)    for the Debtor and against the Defendant in the amount of $102,529.80 through November 30, 2025;

(b)    compelling the Defendant to turnover and deliver the Unpaid Obligations to the Debtor;

(c)    awarding pre- and post-judgment interest on the Unpaid Obligations;

(d)    awarding attorneys' fees and costs; and

(e)    for such other and further relief as this Court deems appropriate.

## COUNT SIX

### (Contractor and Subcontractor Payment Act: 73 P.S. §501, et seq.)

69.    The Debtor repeats and re-alleges the allegations contained in all the preceding

13

paragraphs of this Complaint as if the same were fully set forth herein at length.

70.     The Debtor is a "subcontractor" within the meaning of 73 P.S. §501, et seq. (the "Act").

71.     The Defendant is a "contractor" within the meaning of the Act.

72.     The Arch Street Spire Project was an "improvement" to "real property" within the meaning of the Act.

73.     From November 24, 2025 through and including the filing of this Complaint, the Defendant has failed and refused to pay the Debtor the Unpaid Obligations for the labor, materials and equipment provided by the Debtor and the costs extended by the Debtor on the Arch Street Spire Project in accordance with the Subcontract.

74.     The Defendant failed to give the Debtor any notice, let alone timely notice of any defects in its performance that would justify withholding amounts due to Debtor under the Subcontract for work performed.

75.     The Debtor has submitted invoices for labor, materials and equipment provided by the Debtor and the costs extended by the Debtor on the Arch Street Spire Project as set forth herein.

76.     The Defendant has wrongfully withheld payment to the Debtor for the labor, materials and equipment provided by the Debtor and the costs extended by the Debtor on the Arch Street Spire Project.

77.     The Act entitled the Debtor to payment of one (1%) percent per month interest and one (1%) per month penalty for all amounts wrongfully withheld by the Defendant, together with attorneys' fees incurred in prosecuting this action.

**WHEREFORE,** the Debtor seeks judgment against the Defendant:

(a)     for the Debtor and against the Defendant in the amount of $102,529.80 through November 30, 2025;

(b)      compelling the Defendant to turnover and deliver the Unpaid Obligations to the Debtor;

(c)      awarding statutory interest and statutory penalties on the Unpaid Obligations;

(d)      awarding attorneys' fees and costs for prosecuting this action; and

(e)      for such other and further relief as this Court deems appropriate.

**Respectfully submitted,**

**KARALIS PC**

By:   _/s/ Robert M. Greenbaum_
       ARIS J. KARALIS
       ROBERT M. GREENBAUM
       1900 Spruce Street
       Philadelphia, PA 19103
       (215) 546-4500
       akaralis@karalislaw.com
       rgreenbaum@karalislaw.com

       _Attorneys for the Plaintiff/Debtor_

Dated: March 6, 2026

# **<u>EXHIBIT A</u>**

Subcontract



cvmnext
CONSTRUCTION

1002 West 9th Avenue | King of Prussia | Pennsylvania | 19406 | Phone: 610.964.2800 | Fax: 610.989.3677 |
www.cvmnext.com

# SUBCONTRACT

|  | PROJECT NO. | C24.036.A0 |
|---|---|---|

AGREEMENT made this **7th** day of **January** in the year Two Thousand **Twenty-Five**

BETWEEN the Contractor: **CVM Construction Managers, Inc. d/b/a CVMNEXT Construction**

and the Subcontractor:
> Dan Lepore & Sons Company
> 50 Washington Street, Conshohocken,
> PA 19428

Project:
> Arch Street United Methodist Church Spire Rehabilitation

Owner:
> Arch Street United Methodist Church
> 55 N Broad Street, Philadelphia, PA 19107

Architect:
> CVM Engineers, Inc.
> 1002 W. 9th Avenue
> King of Prussia, PA  19406

Subcontract Price:
> $1,193,000

Contractors Representative: (Principal & Project Manager)
> Sameh Majid
> P: 610.989.3800
> E: SMajid@cvmnext.com
>
> Ray Davis
> P: 610.858.0797
> E: rdavis@cvmnext.com

Subcontractors Representative
> Gino Varacalli
> E: gino@danlepore.com

1

**RECITALS:**

**WHEREAS,** the Principal Contract between Contractor and Owner for the Project, and all contract documents applicable thereto, including those set forth in Exhibit "A" annexed hereto (hereinafter the "Principal Contract"), is incorporated herein by reference; and

**WHEREAS,** Contractor desires to have Subcontractor perform, and Subcontractor agrees to perform, the work for the Project described in Exhibit "B" in strict accordance with the terms and conditions of the Principal Contract and of this Subcontract.

**NOW, THEREFORE,** in consideration of the actual covenants and promises contained herein, and intending to be legally bound hereby, the parties agree as follows:

1.    **The Work.** Subcontractor shall furnish and provide and pay for all labor, materials, tools, equipment, appliances, services, payroll taxes, pension, welfare and benefit contributions, sales and use taxes and all other necessary facilities for the complete performance of the work identified and described in Exhibits "A" and "B" hereto (hereinafter called "Work"). With respect to the Work, Subcontractor shall be bound to Contractor by each and all of the terms and conditions of the Principal Contract, and assume towards Contractor all of those duties, obligations and responsibilities that Contractor by the Principal Contract assumes towards Owner, and Contractor shall have the same rights, remedies and defenses as against Subcontractor as Owner under the Principal Contract has against Contractor, with the same force and effect as though each such duty, obligation, responsibility, right, remedy, or defense were set forth herein in full.

- SCOPE OF WORK TO INCLUDE: Repointing brick (1,700SF)
- Brick replacement (20SF)
- Removal of containment netting & patch anchor holes
- Repoint marble (4,405SF)
- Wall Grouting Void Span (300SF)
- Steel Rod (4 Locations)
- Buttress Reconstruction (4 Locations)
- Trefoil brick infills (20 Locations)
- Type R1 Marble replacement(30 PCS)
- Type R2 Marble replacement(40 PCS)
- Type R3 Marble allowance (30 PCS)
- Type R4 Marble replacement (5 PCS)
- Type R5 Marble replacement (1 PCS)
- Finial reconstruction (3 Locations)
- Stair Repairs (2 Locations)
- Repoint Marble (1,610SF)
- Marble patching (150SF)
- Marble dutchman (50 PCS)
- Marble Roll Pinning (75 PCS)
- Marble panel stabilization pinning (35 PCS)
- Marble exfoliation (1,626SF)
- Marble roll anchor replacement (50 PCS)
- Marble roll patching (100 PCS)
- Marble roll dutchman (25 PCS)

2

- Crack injection (157 LF)
- Repoint back-up  (150 SF)
- Brick replacement (150 SF)
- Helical bed joint reinforcing (30 PCS)
- Type 1 Roll  (27 PCS)
- Type 2 Roll  (31 PCS)
- Type 3 Roll (15 PCS)
- Type 4 Roll (5 PCS)
- Type 6 rectangular panel (100 SF)
- Wall grouting (50 SF)
- Armored joint installation (100 SF)

Subcontractor shall indemnify, defend and hold harmless Contractor from any claim, liability, bond claim, lien, demand, damage, loss, cost and expense, including but not limited to legal fees and consultant, engineering, expert and testing fees and costs, that may be incurred or sustained by Contractor by reason of any breach or alleged breach by Subcontractor of this Subcontract. Subcontractor's obligation to indemnify and hold Contractor harmless is in addition to Subcontractor's obligation to defend Contractor. In addition, Subcontractor shall indemnify and defend Contractor and Owner from all such costs, expenses, damages and liability, including but not limited to legal fees and consultant, engineering, expert and testing fees and costs as it pertains to their work

2.    **Time of Commencement and Completion.** The Work shall be in accordance with CVMNEXT project schedule.  Work to commence 12/19/2024 and Subcontractor shall substantially complete the Work no later than 10/15/2025. Subcontractor shall undertake whatever actions are necessary to comply with any of the time requirements specified in the Principal Contract, in the Project schedule and in this Subcontract and to achieve timely completion of the Work without hindering, interfering with or delaying any work of Contractor, Owner or other contractors. Should the progress of the Work or of the Project be hindered, interfered with or delayed by any fault, neglect or act of Subcontractor or its sub-subcontractors, suppliers or vendors so as to cause any additional cost, expense, liability or damage to Contractor or Owner, Subcontractor shall indemnify and defend Contractor and Owner from all such costs, expenses, damages and liability, including but not limited to liquidated damages to the extent applicable legal fees and consultant, engineering, expert and testing fees and costs.  All times specified in the Principal Contract and this Subcontract are of the essence of the parties' agreement.

Subcontract Price. Contractor shall pay Subcontractor and Subcontractor shall accept in full payment for its scope of work hereunder the total sum of **$1,193,000 One Million One Hundred Ninety Three Thousand s**ubject to additions and deductions as provided herein. (Exhibit "B") shows approximate quantities, unit prices and totals when applicable.  Subcontractor's proposal, bid, estimate and/or any other documents prepared by Subcontractor in anticipation of performing work on the Project, shall serve as a reference (Exhibit "B"). The Subcontractor expressly agrees to comply with the terms and conditions of the subcontract agreement. The contract drawings and specifications (Exhibit "C") and the specifications addressed in the Master Contract with the Owner (Exhibit "A"). Subcontractor agrees to make no substitutions to these drawings or specifications unless expressly granted in writing by the owner.

4.    **Submittals.** Upon Contractor's request, or as required by the Principal Contract, Subcontractor shall prepare and submit schedules, shop drawings, product descriptions, samples,

3

progress and manpower reports and projections with respect to its Work.

**5.    Cooperation.** Subcontractor shall comply with all jobsite work rules in the performance of the Work and cooperate with Contractor in scheduling and performing Subcontractor's Work to avoid conflict, delay in or interference with the work of Contractor, other subcontractors, or Owner's own forces and agrees to strictly follow all orders or other work directives issued by Contractor relating to the performance of the Work. Subcontractor agrees to participate in a minimum of One (1) pre-construction meeting with Contractor, and will also attend scheduled meetings with a notice of no less than 48 hours. Further cooperation requirements are identified in Contractor's Policies, copies of which are attached to this Subcontract and incorporated herein by reference. In addition, Subcontractor shall take all necessary precautions to protect the Work and the work of other subcontractors from damage caused by Subcontractor's operations.

**6.    Progress and Final Payment.** Subcontractor shall a monthly payment application which shall include a detailed breakdown of Subcontractor's Work of Schedule of Values to the Contractor's Representative and apayable@cvmnext.com by the 20th day of each month, projecting out to the end of the month. Subcontractor shall withhold 10% retainage within payment application unless directed otherwise by Contractor. Contractor must submit its application for payment to Owner (25th day of the month) and, unless another form is specified, shall make its applications on the current version of AIA forms G702 and G703. **Each application for payment shall include a fully executed Certification and Partial Release of Liens and Claims in the form specified in Exhibit "G"** hereto and made a part hereof (Certification and Partial Release of Liens and Claims). Once the payment application has been approved and submitted in accordance with Section 6 of the subcontract document, the Contractor, within 14 days of receipt of each progress payment from the Owner, shall pay the Subcontractor for their application. If Subcontractor does not submit its application on time and does not include a fully executed Certification and Partial Release of Liens and Claims, Contractor shall have the right to withhold processing of the application until the next monthly billing cycle or until it receives a fully executed Certification and Partial Release of Liens and Claims, whichever is later. Contractor shall have no obligation to make a progress payment to Subcontractor for Work performed unless and until Contractor has received payment in full for such Work from Owner. To the extent that Contractor actually receives a progress payment from Owner for Work performed by Subcontractor, Contractor will pay to Subcontractor from such progress payment, an amount in proportion to the amount or percentage of Work completed, less the percentage retained from payments by Owner to Contractor, and less the aggregate of all payments to Subcontractor, and less any amount which in Contractor's opinion relates to defective Work and less any amount that Contractor is otherwise permitted to withhold or deduct under this Subcontract.

In addition, Contractor shall have no obligation to make final payment to Subcontractor unless and until: (a) Subcontractor's Work is fully performed in accordance with this Subcontract; (b) Subcontractor's Work is reviewed and accepted by Contractor and Owner; (c) Subcontractor has acquired and forwarded to Contractor a Final Certification and Release of Liens for all Sub-Subcontractor and Vendors  (Exhibit "H") and (d) Subcontractor has furnished Contractor with a fully executed Final Certification and Release of Liens and Claims in the form specified in Exhibit "I" hereto and made a part hereof (Final Certification and Release of Liens and Claims ), and, if applicable, insurance certificates pursuant to paragraph 9.  In the event that Contractor does not receive final payment from Owner in full for any reason whatsoever, the amount of the final payment due to Subcontractor shall be limited to a pro-rata share of the amount of the final payment that Contractor actually received from Owner, regardless of whether the amount of the final payment that Contractor actually received from Owner was a result of a compromise,

4

settlement or other resolution relative to final payment. The amount of Subcontractor's pro-rata share of such final payment shall be determined by Contractor. No payment or occupancy or use of the Project shall constitute acceptance of any Work, including any Work not conforming to any warranty under Paragraph 13.

In addition: (a) if at any time Subcontractor shall be indebted to Contractor in connection with any other Subcontract or written agreement between the parties, or with respect to any other project on which Subcontractor shall have performed work for Contractor, Contractor shall have the right to withhold payment of and deduct from any progress or final payment otherwise due hereunder the amount of such other indebtedness of Subcontractor; and (b) if at any time Subcontractor shall be indebted to Contractor under this Subcontract in an amount which exceeds the unpaid balance of the Subcontract Price, Subcontractor authorizes Contractor to withhold payment of such excess amount, and deduct it from, any progress or final payment otherwise due in connection with any other Subcontract or written agreement between the parties, or with respect to any other project on which Subcontractor shall have performed work for Contractor.

7. **Conditions of Payment.** In addition to any other requirements of the Principal Contract, Subcontractor shall be required to perform the following during each billing period before submitting each Application for Payment and its final Application for Payment If Subcontractor fails to do so, Contractor may withhold or deduct from payment an amount Contractor deems sufficient to remedy such failure:

a) review with Contractor the quantity of Work performed during the billing period and submit for payment no more than the quantity of Work actually performed;

b) pay to Contractor, or deduct from the amount invoiced, the amount of any and all charges for equipment or services furnished by Contractor to Subcontractor in connection with Subcontractor's Work including, without limitation, cleaning, trash removal, dumpsters, hoisting, Work, labor, services, materials, plant, equipment, tools, scaffolds, appliances, heat, light, power, water, and any other thing furnished by Contractor to Subcontractor;

c) pay to Contractor, or deduct from the amount invoiced, the amount of all costs, expenses, losses and or damages incurred by Contractor, through its own forces or by others, to perform Work or other duties and obligations which are the responsibility of Subcontractor and to correct, repair, or replace the Work or property of Contractor or others damaged by Subcontractor or through the fault or neglect of Subcontractor;

d) provide any increased retainage, bond, collateral, security, waiver, release, certification, affidavit or other documents required by the Principal Contract or this Subcontract; and

e) pay to Contractor, or deduct from the amount invoiced, all other sums or damages for which Subcontractor is liable under the Principal Contract or this Subcontract.

Contractors failure to give, or timely give, notice of: (1) any error in an invoice or application for payment submitted by Subcontractor for payment; or (2) any deficiency or non-compliance with the Principal Contract with respect to any Work for which payment is requested, shall not waive or limit any of Contractor's rights or defenses, or require Contractor to make a

5

payment in advance of the time, or in an amount greater than, as provided by this Subcontract.

Subcontractor shall make payments to its sub-subcontractors, suppliers and vendors in a timely manner and in accordance with the provisions of any applicable law governing the time, conditions or requirements for such payments and shall comply with the provisions of any such law. Upon request by Contractor, Subcontractor shall furnish satisfactory evidence to verify payment for all Work in compliance with this paragraph.

**REQUIRED INFORMATION TO RECEIVE FINAL PAYMENT:**

**The following documents required by the Owner shall be submitted to the Contractor's project manager listed on page one (1) of this subcontract agreement in order for the Contractor to release the final payment.**

- Shop Drawings, if applicable
- Material Warranty, if applicable
- Operations and Maintenance Manuals, if applicable
- Copies of all Permits and Inspections
- Per Section 13 of this subcontract agreement, a one-year written standard workmanship/labor warranty on Subcontractor's letterhead is required.
- Subcontractor shall submit to the Contractor, a final notarized waiver to apayable@cvmnext.com.
- Once all documents above have been submitted and accepted by the Contractor, final payment shall be released in accordance with the payment terms in Section 6.

**8.    Bonds.** If Owner or Contractor requires Subcontractor to furnish bonds, prior to the performance of any Work hereunder or the furnishing of any labor or materials, Subcontractor will at its sole expense furnish Contractor with a bond conditioned upon the full and faithful performance of all the terms and conditions of this Subcontract and a separate bond conditioned upon the full and prompt payment for all labor, materials and obligations relating to the Work, each such bond in the full amount of the Subcontract Price and indemnifying Contractor against any loss, costs, expenses or damages suffered by Contractor as a result of any such default, including but not limited to legal fees and consultant, engineering, expert and testing fees and costs. The form of the bond and the responsibility of the surety shall be satisfactory to Contractor.

**9.    Insurance.** Prior to commencing the Work, Subcontractor shall obtain and maintain the following insurance at its own expense, with responsible insurance companies satisfactory to Contractor in amounts not less than those specified below:

i.  Commercial General Liability Insurance:

| | | |
|---|---|---|
| a. | Each Occurrence Limit | $1,000,000 |
| b. | Damage to Rented Premises | $50,000 |
| c. | Medical Expenses (any one person) | $10,000 |
| d. | Personal and Advertising Injury Limit | $1,000,000 |
| e. | General Aggregate | $2,000,000 |
| f. | Products/Completed Operations Aggregate | $2,000,000 |

ii.  Comprehensive Automobile Liability Insurance:

| | | |
|---|---|---|
| a. | Combined Single Limit | $1,000,000 |

| | | | | |
|---|---|---|---|---|
| iii. | Excess/Umbrella: | | | |
| | a. | Excess/Umbrella Limit | | $4,000,000 |
| iv. | Workers Compensation and Employers Liability: | | | |
| | a. | Workers Compensation | | Statutory Limits |
| | b. | Employers Liability | | |
| | | i. | Each Accident | $1,000,000 |
| | | ii. | Disease – Each Employee | $1,000,000 |
| | | iii. | Disease – Policy Limit | $1,000,000 |
| v. | | Professional Liability | | $2,000,000 |

*v.*        *If Subcontractor is to provide services that might result in pollution hazards or liabilities, Subcontractor shall maintain Pollution Liability insurance Limits of at least $2,000,000/incident/aggregate or in accordance with industry best practices, whichever may be greater). Pollutants can mean any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste; however, this list is not exhaustive. Subcontractor's Pollution Liability insurance limits shall not contain mold exclusion.*

*vi.*        *If Subcontractor is to provide services involving asbestos, lead abatement, or other pollutant containing materials under this Subcontract, Subcontractor shall maintain Pollution Liability Limits, including Asbestos Abatement Liability Limits covering Bodily Injury and Property Damage liability to third persons or parties arising from asbestos incidents, including pollution, with limits of liability not less than $1,000,000. Such insurance may be provided by endorsement to the Commercial General Liability insurance described in Section 9.i above.  Pollutants can mean any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste; however, this list is not exhaustive.  Subcontractor's Pollution Liability insurance shall not contain mold exclusion.*

*vi.*        *If Subcontractor is to provide Professional Services (such professional services including, but not limited to, engineering, architecture, estimating, scheduling, surveying, accounting, legal, etc.) under this Subcontract, Subcontractor shall maintain Professional Liability Limits of at least $2,000,000/incident/aggregate.*

In addition, if and to the extent that the Principal Contract requires Subcontractor to provide additional insurance coverages, limits or certificates, Subcontractor shall timely provide such additional coverages, limits and certificates, at its sole cost. The certificate holders as well as the Description of Operations/Additional Insured requirements are listed on Exhibit "E". Project number must be referenced on the certificate.

Before commencing the Work, Subcontractor shall furnish a certificate, satisfactory to Contractor, from each insurance company showing that the above insurance is in force, stating policy numbers, dates of expiration and limits of liability thereunder, and further providing that the insurance will not be canceled or changed until the expiration of at least thirty (30) days after written notice of such cancellation or change has been mailed to and received by Contractor. If Subcontractor's Work requires hazardous or unusual operations such as, but not limited to, excavation, rigging or blasting, Subcontractor shall procure and maintain any additional coverage(s) and/or higher limits of liability which Contractor may reasonably require. Contractor shall be named as an additional insured under all policies of commercial general liability insurance (including completed operations coverage), automobile liability insurance and excess (or umbrella) liability insurance provided by Subcontractor, and the

additional insured status provided must be on a primary and non-contributory basis. The insurance shall be maintained without interruption from the date of commencement of the Work until the date of final payment. The products and completed operations coverage required under Paragraph 9 shall be maintained without interruption from the date of commencement of the Work until one (1) year after the date of final payment. If Subcontractor fails to procure and maintain such insurance, Contractor shall have the right, but not the obligation, to procure and maintain the said insurance for and in the name of Subcontractor and Subcontractor shall pay the cost thereof and shall furnish all necessary information to make effective and maintain such insurance.

In the event that a claim is filed against the Contractor relative to work performed by the Subcontractor, the Subcontractor shall reimburse the Contractor $5,000, for the Contractor's deductible on claims defense of the Contractor's GL policy, unless the Subcontractor demonstrates that they have maintained the minimum GL occurrence, aggregate, completed operations coverage amounts, and state specific WC liability coverage.

Subcontractor waives all subrogation rights against Contractor, Owner and any of their agents and employees for damages caused by fire or other perils to the extent covered by property insurance provided under the Principal Contract or other property insurance applicable to the Work, except such rights as they may have to proceeds of such insurance held by Owner as fiduciary. Subcontractor shall require of the Subcontractor's sub-subcontractors, agents and employees by appropriate agreements, written where legally required for validity, similar waivers in favor of other parties enumerated herein.  The policies shall provide such waivers of subrogation by endorsement or otherwise.  A waiver of subrogation shall be effective as to a person or entity even though that person or entity would otherwise have a duty of indemnification, contractual or otherwise, did not pay the insurance premium directly or indirectly, and whether or not the person or entity had an insurable interest in the property damaged.

**10.    Hold Harmless.** Subcontractor shall indemnify and forever hold harmless Contractor and its agents, servants and employees and Owner from and against all claims, damages, losses, costs and expenses, including but not limited to attorney's fees, arising out of, in connection with or resulting from any bodily injury, sickness or death or from any injury to or destruction of property sustained in connection with or arising out of any act or omission in the performance of any Work hereunder by Subcontractor, its agents, servants, employees, suppliers, materialmen or subcontractors (regardless of whether or not such claim, damage, loss, cost or expense is caused in part by a party indemnified hereunder) and Subcontractor shall defend, at its own expense, any proceedings brought against Contractor, its agents, servants or employees or Owner on account thereof, and shall pay all expenses incurred and satisfy all judgments rendered against Contractor, or any of them in connection therewith. Subcontractor, however, shall report to Contractor within twenty-four (24) hours of any injury to an employee or agent of Subcontractor which occurred at the site as well as any other claims, damages, or losses and shall provide written documentation of injury and subsequent investigation into cause of injury as conducted by Subcontractor.  Subcontractor expressly agrees that its indemnification obligation shall not be limited by any limitation or statutory or constitutional immunity it may enjoy with respect to the amount or type of damages, compensation or benefits payable by or for Subcontractor of Subcontractor's sub-subcontractors under any liability imposed by law, including, but not limited to, workers' compensation acts, disability benefits acts or other employee benefit acts.

**11.    Responsibility of Subcontractor.** Subcontractor shall operate as an independent contractor and not as an agent of Contractor. The liability of Subcontractor under this Subcontract

shall not be limited by the policy limits set forth in Paragraph 9 hereof. The Work shall be performed to Contractor's satisfaction. Subcontractor shall be responsible for accepting and unloading any and all material delivered to the job site for their work only.  Subcontractor shall be responsible for all Work, whether performed or furnished by Subcontractor's own forces, or by its sub-subcontractors, suppliers or vendors. Contractor makes no representation or warranty to Subcontractor that any materials or equipment stored by Subcontractor at the Site or within the Project, whether in such storage areas or elsewhere, shall be safe, secure, or that materials or equipment stored therein shall not sustain damage, theft, loss, or other events resulting in their destruction or diminution in value.  Subcontractor shall be responsible for accepting and unloading any and all material delivered to the job site for their work only.

12.     **Drawing and Plans.** When drawings and plans for the Work show conditions as they are supposed or believed to exist, it is not intended or to be inferred that the conditions as shown thereof constitute a representation or warranty, expressed or implied, by Contractor that such conditions are actually existent, nor shall Subcontractor be relieved of the liability under this Subcontract nor shall Contractor be liable for any loss sustained by Subcontractor as a result of any variance between conditions as shown on the plans and the actual conditions revealed during the progress of the Work or otherwise.

13.     **Warranties.** Subcontractor shall warrant its Work in accordance with the terms of the Principal Contract and, in addition to and not in limitation of any warranties in the Principal Contract, or any other warranties either expressed or implied, Subcontractor warrants that all materials furnished and incorporated by it in the Work shall be new and of the finest quality unless otherwise specified, and suitable for the purposes for which it is intended, and that all Work hereunder shall be of the finest workmanship, free from faults and defects and in conformance with the Principal Contract, drawings, plans and specifications. No substitutions shall be made to the materials required under the drawings and Specifications, except upon prior written consent of the Owner, Architect and Contractor. Work not conforming to the Principal Contract, including substitutions not properly approved and authorized, may be considered defective. Subcontractor shall, upon notice, promptly correct, remove, replace or otherwise remedy any and all of Subcontractor's Work which is defective, or fails to conform to its warranties under this paragraph, as well as any damage to Work, the work or property of Contractor, Owner, or other contractors on the Project caused by the defect or failure, at its sole expense. For a period of one (1) year after substantial completion of the Project, Subcontractor shall promptly correct any Work found to be not in accordance with the requirements of the Contract Documents, upon receipt of written notice from the Owner or Contractor. This obligation under Section 13 shall survive the acceptance of the Work under the Subcontract and termination of the Subcontract. Subcontractor shall provide Contractor a warranty for Work completed in a form acceptable to Contractor upon substantial completion of said Work.

**One (1) year Standard Warranty applies.**

14.     **Inspection.** Contractor shall at all times have access to the Work.  All materials furnished and workmanship performed by Subcontractor shall be subject to periodic and final inspections, tests and acceptance by Contractor and Owner upon completion of all Work, whether or not paid for.  Any material or Work found to be defective or not in conformity with the drawings, plans, specifications, the Principal Contract or this Subcontract, shall be rejected and Subcontractor at its own expense, shall promptly correct the defective Work and replace the defective material furnished by it, otherwise Contractor may do so and subtract all incurred costs thereof, together with the costs of any legal fees and consultant, engineering, expert and testing fees and costs, from

the sums owing to Subcontractor under this Subcontract. However, if no sums are due and owing to Subcontractor, then Contractor shall recover from Subcontractor the costs of correcting the defective Work or material, together with the costs of such recovery, including but not limited to: legal fees and consultant, engineering, expert and testing fees and costs.

     **15.**    **Changes.** Contractor reserves the right either before commencement of the Work or during the progress of the Work or both, to make changes in the Work included in this Subcontract. No additions, deductions or other changes shall be made in the Work, nor there any charges for premium time, except upon written order of an authorized representative of Contractor. Said order shall specify the amount of additional compensation or credit, if any, to be applied to the Subcontract Price, and the amount of each such change shall be determined as follows:

    a)    If a change is made pursuant to the change order provisions of the Principal Contract, the amount of adjustment for additional Work shall be the same as Owner adds to Contractor's price for the additional Work performed by Subcontractor, excluding such sum as Owner may have included or added for Contractor's overhead and profit; and the amount of adjustment for omitted Work shall be the same as Owner deducts from Contractor's price for the Work Subcontractor was directed to omit, unless this Subcontract otherwise provides, or the parties mutually agree upon other terms.

    b)    If the change will have been made for reasons other than those referred to in the preceding subparagraph (a) above and if this Subcontract does not otherwise provide, the amount of adjustment shall be determined by negotiation between the parties hereof.

    c)    In the event that the parties are unable to agree on the amount of such adjustment under subparagraph (b) above, then Subcontractor shall receive as full and complete compensation for the change the actual direct cost of performing the Work, as established by his books and records subject to Contractor's audit, without any add-ons for supervision, overhead, profit or any other element of compensation except as provided below and in such event, Contractor shall have the option by written notice, at any time, of furnishing all or any part of labor or materials to be used in the performance of any such change.

If Subcontractor proceeds with any changed Work without Contractor's written authorization to perform same, Subcontractor shall be deemed to have waived any additional compensation therefor. Subcontractor shall provide written notice to Contractor with respect to any work for which it contends it is entitled to additional compensation, reimbursement or additional time to perform. Subcontractor shall provide Contractor with such written notice within three (3) business days of when Subcontractor first learns that it is, or may be, expected to perform such work. Such notice shall state with specificity the basis for its claim that it is entitled to additional compensation, reimbursement or additional time to perform such work, and the amount of additional compensation, reimbursement or additional time that it claims. Subcontractor's markup for supervision, overhead and profit shall not exceed a combined percentage of ten percent, or the markup permitted by the Principal Contract, whichever is less, and that no overhead or profit shall be added to any change order for overtime or premium time work.
Subcontractor's failure to timely and properly provide such written notice shall constitute a waiver of any claim that such work constituted extra or additional work for which additional compensation,

reimbursement or additional time is due, and Subcontractor shall be barred from any recovery from Contractor on account thereof.

In the event of a dispute between Contractor and Subcontractor regarding changes made by the Owner or Contractor to the Work, or regarding any claim by Subcontractor for additional or extra work or deleted Work, or any other disputes related to the scope of Subcontractor's Work, Subcontractor shall expeditiously and diligently proceed with the performance of its Work under this Subcontract and any other work which is the subject of such dispute that Contractor directs Subcontractor to perform.

      **16.**    **Contiguous Work.** Subcontractor shall carefully inspect other work for its suitability to receive Subcontractor's Work, take all necessary measurements and perform its Work in such a manner as to achieve proper fitting and matching with contiguous work.

      **17.**    **Delays.** Should Subcontractor be delayed, hindered or interfered with in the commencement, prosecution or completion of the Work by any cause, including but not limited to any act, omission, neglect, negligence or default of Contractor or of anyone employed by Contractor, or by any other contractor or subcontractor on the Project, or by the Architect, Owner or their contractors, subcontractors, agents or consultants, or by Owner, or by damage caused by fire or other casualty or by the combined action of workers or by governmental directive or order not chargeable to Contractor, or by any extraordinary conditions arising out of war or government regulations, or by any other cause beyond the control of and not due to any fault, other cause beyond the control of and not due to any fault, neglect, act or omission of Subcontractor, its officers, agents, employees, subcontractors or suppliers, then Subcontractor shall be entitled to an extension of time provided Subcontractor (1) notifies Contractor in writing of the cause or causes of such delay, obstruction, hindrance or interference within forty eight (48) hours of the commencement thereof and (2) demonstrates that it could not have anticipated or avoided such delay, obstruction, hindrance or interference and has used all available means to minimize the consequences therefor, and (3) provides Contractor with a detailed and properly substantiated analysis of the specific activities of Subcontractor that were delayed, obstructed, hindered or interfered with, and the period of time that each such activity was so impacted. Notwithstanding anything to the contrary in this paragraph 17, Subcontractor shall only be entitled to an extension of time to the extent Owner grants Contractor a corresponding extension of time and, in that event, shall be limited to the duration of the extension of time that Owner grants to Contractor.

      Subcontractor agrees that it shall not be entitled to nor claim any cost reimbursement, compensation or damages for any delay, obstruction, hindrance or interference to the Work except to the extent that Contractor is entitled to corresponding cost reimbursement, compensation or damages from Owner under the Principal Contract for such delay, obstruction, hindrance or interference, and then only to the extent of the amount, if any, which Contractor, on behalf of Subcontractor, actually receives from Owner on account of such delay, obstruction, hindrance or interference. Contractor shall have no obligation to prosecute or pursue any claim on behalf of Subcontractor unless and until Contractor and Subcontractor agree on the terms by which such claim will be pursued or prosecuted, including agreement as to which party will bear the cost of any attorneys' fees, expert and/or consultant fees, and how any recovery will be shared.

      In the event of a dispute between Contractor and Subcontractor regarding any delay,

obstruction, hindrance or interference to the Work, or while any claim by Subcontractor relative thereto is pending, Subcontractor shall expeditiously and diligently proceed with the performance of its Work under this Subcontract in accordance with the Project schedule. If the Subcontractor defaults under or to carry out the Work in accordance with the Contract Documents within a five (5) day period after written Notice of Default and Request to Cure from Contractor to commence and continue correction of such default or with diligence and promptness, the Contractor may, without prejudice to any other remedies the Contractor may have, carry out the Work or otherwise cure the default deduct the reasonable cost thereof from the payments then and thereafter due the Subcontractor.

18.    **Debris.** Subcontractor shall at all times during the performance of its Work, remove all .debris and waste material and keep and leave the site in a condition satisfactory to Contractor. Subcontractor shall store, transport and dispose of all waste material in accordance with all applicable laws, rules, regulations and ordinances of all Federal, state and local authorities having jurisdiction, including, without limitation, the regulations promulgated by the Environmental Protection Agency and by the Pennsylvania Department of Environmental Protection or regulatory agencies in the state which the project exits. Subcontractor shall obtain, maintain and submit all waste shipment records required by law. Disposal must occur at an authorized landfill site in accordance with regulatory requirements of all applicable state and Federal guidelines and regulations. Subcontractor may not dispose of any waste as clean fill. If Subcontractor fails to do periodic clean up during the performance of the work, and /or fails to clean up after their work is complete, Contractor reserves the right to undertake the clean-up and back charge the Subcontractor for the additional time, labor, dumpster rental or landfill disposal fees, or permit fees to make the Contractor whole. Contractor may, at its discretion, provide a dumpster for use by Subcontractors for disposal of general construction debris.

19.    **Waiver of Liens.** To the fullest extent permitted by law, such as where the Project is for a public purpose or a residential property, or where Contractor has posted a payment bond, Subcontractor, for itself, its subcontractors, suppliers, materialmen, agents, servants and employees and all other persons claiming under them, hereby waives the right to file mechanics' or any other liens for or on account of the labor performed or materials furnished hereunder, including any extra or additional Work. Subcontractor shall indemnify and defend Contractor and Owner from and against any mechanic's or other lien asserted by any of Subcontractor's subcontractors, suppliers, materialmen, agents, servants and employees and all other persons claiming under them. Subcontractor's obligation to indemnify and hold Contractor harmless is in addition to Subcontractor's obligation to defend Contractor. With respect to any obligation of Subcontractor to indemnify and hold Contractor harmless, Contractor, at its sole option, also may tender its defense to Subcontractor. If Contractor tenders its defense to Subcontractor, then Subcontractor shall defend Contractor at Subcontractor's expense. Contractor shall have the right to approve any counsel Subcontractor intends to use in such defense, which approval shall not be unreasonably withheld. If Contractor chooses to defend itself, then Subcontractor shall pay Contractor's costs of defense. If, after tendering its defense to Subcontractor, Contractor becomes dissatisfied as to the quality or diligence of the defense provided by Subcontractor or if conflicts of interest arise during the course of the defense provided by Subcontractor, then Contractor may employ its own counsel to participate in its defense or resume its own defense and Subcontractor shall pay Contractor the costs of such defense.

20.    **Proprietary or Intellectual Right or Interest.** Subcontractor shall defend all duties relating to and shall indemnify and forever hold harmless Contractor and Owner from any and all claims, damages, costs and expenses resulting from any infringement of any proprietary or

12

intellectual rights or the misuse of any patented article by Subcontractor in the performance of the Work. Subcontractor's obligation to indemnify and hold Contractor harmless is in addition to Subcontractor's obligation to defend Contractor. With respect to any obligation of Subcontractor to indemnify and hold Contractor harmless, Contractor, at its sole option, also may tender its defense to Subcontractor. If Contractor tenders its defense to Subcontractor, then Subcontractor shall defend Contractor at Subcontractor's expense. Contractor shall have the right to approve any counsel Subcontractor intends to use in such defense, which approval shall not be unreasonably withheld. If Contractor chooses to defend itself, then Subcontractor shall pay Contractor's costs of defense. If, after tendering its defense to Subcontractor, Contractor becomes dissatisfied as to the quality or diligence of the defense provided by Subcontractor or if conflicts of interest arise during the course of the defense provided by Subcontractor, then Contractor may employ its own counsel to participate in its defense or resume its own defense and Subcontractor shall pay Contractor the costs of such defense.

All patent, copyright, and trademark rights associated with said Work and not previously developed or owned by the Owner's consultants, Architect, or Architect's consultants and the agents or employees of any of them shall be long to the Owner.

**21.    Hazardous Substances.** If hazardous substances of any type are brought to, stored or used on the site by Subcontractor, Subcontractor's sub-subcontractors, or anyone directly or indirectly employed by them, Subcontractor shall comply with all laws relating to solid or hazardous waste handling, storage and disposal, and, prior to their arrival, give written notice five (5) days prior of the chemical composition thereof to Contractor in sufficient detail and time to permit compliance with any laws by the Contractor, other subcontractors and other employees on the site.

**22.    Safety.** In the performance of this subcontract, this Subcontractor shall, at no additional cost to Contractor, comply with all applicable safety rules, regulations laws and enactments, including local, city, state and federal and the current provisions of the Occupational Safety and Health Act (hereinafter "OSHA") during the conduct of Subcontractor's Work on and in connection with this Subcontract and shall be bound to the requirements of Contractor's safety manual. Subcontractor shall indemnify Contractor for fines, penalties and corrective measures that result from the acts of commission or omission by Subcontractor, Subcontractor's agents, employees and assigns in failure to comply with such safety rules, regulations, laws and enactment. Minimum five (5) days prior to start, Subcontractor shall submit to Contractor an electronic and hard copy of Subcontractor's safety manual, site specific safety plan and SDS book. Failure to do so shall constitute grounds for removal from the job site. If Subcontractor fails to perform work in a safe manner, Contractor may notify Subcontractor and take action to remove Subcontractor from site until corrected. In addition, Subcontractor agrees to pay Contractor for violations of OSHA requirements in accordance with the OSHA schedule of penalties. Subcontractor must have a Company Safety Program, including a Company Safety Policy Statement, Safety Rules & Procedures for on-site operations, Written Hazard Communication Program in compliance with OSHA Hazard Communication Standard 1926.59, Enforcement Procedures by Management, Supervisor Training & Education, and Employee Training Program. Subcontractor must implement a Site Safety Program that includes:

a) Subcontractor must submit a complete listing of paints, chemicals, toxic or hazardous materials, or materials determined to fall within government reporting requirements, along with Safety Data Sheets (SDS) for each, to the Contractor's Superintendent/Safety Representative at the time the material is brought on-site.

13

b) Subcontractor will provide the Contractor with all required reports and safety statistical information, complete and in a timely manner along with established contractor safety reporting guidelines as established by the site safety program.

c) Subcontractor will provide a safety representative to attend all scheduled safety meetings and scheduled walk-through safety inspections of work areas.

d) Subcontractor will provide site specific safety orientations for all new employees.

e) Fire prevention and protection in the Subcontractor work area is the responsibility of the Subcontractor. Adequate fire extinguishers will be supplied by the Subcontractor for Subcontractor work activities.

f) Subcontractor will hold weekly safety meetings for all Subcontractor employees and will retain documentation of the safety meeting, including the employees' signatures of attendance until project completion.

g) Subcontractor will maintain documentation of all required indoctrination, training, and education programs and retain this documentation until project completion.

*h)* Subcontractor shall designate a person, who has at least 30 hours of OSHA training, as their full time, on-site safety representative prior to the commencement of its Work and such person must be acceptable to the Contractor. Should the Contractor not accept such designee, the Subcontractor agrees to designate a different person until a satisfactory person is accepted by Contractor.

23. **Dispute Resolution.** At the sole election of Contractor, any and all claims, disputes, breaches of contract or other matters in question shall be subject to (1) mediation in accordance with the American Arbitration Association's Construction Industry Mediation Rules; (2) arbitration in accordance with the American Arbitration Association's Construction Industry Arbitration Rules; or (3) judicial proceedings. In the event the Principal Contract provides for arbitration or other contractual dispute resolution procedures with respect to any or all claims, disputes, breaches of contract or other matters in question between Owner and Contractor thereunder, then all claims, disputes and other matters in question arising out of or relating to this Subcontract or the breach thereof, shall, at the sole election of Contractor, be decided by arbitration or other contractual dispute resolution procedures in the same manner and under the same procedure as provided in the Principal Contract with respect to disputes between Owner and Contractor. In addition, Subcontractor hereby agrees that Contractor shall have the right to include Subcontractor by consolidation, joinder or in any other manner, in any arbitration or other dispute resolution proceeding, irrespective of who originally initiated such proceedings. The foregoing agreement to arbitrate or participate in other dispute resolution procedures shall be specifically enforceable under the prevailing arbitration law. Unless Contractor elects otherwise, any arbitration or other dispute resolution proceeding hereunder shall be held at the place where the Project is located. Pending determination, there shall be no work stoppage by Subcontractor. The award rendered by the arbitrators in any arbitration under this paragraph shall be final and judgment may be entered thereon in accordance with applicable law in any Court having jurisdiction thereof.

24. **Compliance with Laws.** Subcontractor shall comply with all executive orders, federal, state and local laws, rules and regulations as are applicable to the Work under this

14

Subcontract, including but not limited to those relating to discrimination in employment, fair employment practices, equal employment opportunity, fair labor standards or payment of prevailing wages, and regulations and any required contract provisions and/or other regulations referred to in the Principal Contract or attached as an Attachment to this Subcontract.

**25.   Nonwaiver.** The failure of Contractor to enforce any of the terms and conditions, or to exercise any right to privilege in this Subcontract, shall not be construed as a waiver of any such terms and conditions or rights or privilege and the same shall continue to remain in force and effect as if no such failure to enforce or exercise had occurred.  No waiver by Contractor shall be valid unless expressly stated in a change order.

**26.   Permits.** Except for those permits supplied by Owner under the Principal Contract, Subcontractor shall secure and pay for all permits, fees and licenses necessary for the prosecution of the Work and shall give all notices and comply with all laws, ordinances, regulations and rules bearing on the performance of the Work. Subcontractor shall hold Contractor harmless from any liability or penalty arising out of any violation of this paragraph.  Subcontractor shall possess and maintain all required contractor, trade, municipal or state licenses as applicable for this project. Subcontractor shall forward an electronic copy of said licenses to the Contractor prior to starting work on the project.

**27.   Default.** In the event Subcontractor at any time does any of the following: fails in any respect to prosecute the Work required hereunder; performs or fails to correct defective work, fails to perform any of the covenants or agreements contained herein; becomes insolvent; makes an assignment for the benefit of creditors; or fails to make prompt payment to its laborers, materialmen, suppliers or subcontractors; Contractor may, upon **72 hours' notice,**  in addition to any other remedy under this Subcontract, at law or in equity: (a) perform and furnish through others all or any part of the Work remaining to be completed or (b) at its option, terminate Subcontractor's employment under this Subcontract and complete the Work. Contractor may deduct from any unpaid balance due Subcontractor its expenses of completing the Work and such other costs and damages, including but not limited to legal fees and consultant, engineering, expert and testing fees and costs (including 15%  markup for Contractor's overhead and profit), as Contractor may suffer as a result of Subcontractor's default, and Subcontractor shall be liable for and shall pay upon demand any excess of Contractor's expense of completing the Work and other costs and damages over any unpaid balance due Subcontractor hereunder, including the legal fees and costs of recovering from Subcontractor should Subcontractor not immediately pay upon such demand.

**28.   Termination.** In the event that the Principal Contract between Contractor and Owner is terminated or canceled, Contractor may, without liability, terminate this Subcontract upon written notice to Subcontractor who, unless the notice directs otherwise, shall immediately discontinue the Work and the ordering of materials in connection therewith and shall cancel all existing orders. In such event, Subcontractor shall be paid, subject to the provisions of paragraphs 6 and 7 hereof, its pro rata compensation for the portion of the Work performed and materials furnished, without lost or anticipated profits. Subcontractor's indemnity, warranty, and other obligations with respect to Work performed shall continue notwithstanding such termination.

**29.   Conflicts.** In the event of any conflict between the terms and provisions of the Principal Contract, plans, drawings and specifications on the one hand and the terms and provisions of this Subcontract on the other, the term or provision imposing the greater duty or responsibility upon Subcontractor shall govern.

15

30.    **Notices.** All notices given hereunder shall be sent by certified mail, return receipt requested, properly addressed to the parties at their address as shown on the first page hereof, or may be delivered at the job site or elsewhere on the authorized Contractor's Representative or Subcontractor's Representative of the party to whom the notice is directed.

31.    **Assignment.** Neither this Subcontract, the Work hereunder, or any part thereof, nor any monies due or to become due hereunder may be assigned, transferred, sublet or subcontracted by Subcontractor without the prior written consent of Contractor.

32.    **Entire Agreement.** This Subcontract contains the entire agreement between the parties and there are no other oral or written understandings of any kind. Subcontractor represents and agrees that it has carefully reviewed the Principal Contract and the nature, location and conditions of the site of the Project and enters into this Subcontract upon the basis of its own review and not in reliance upon any representations of Contractor or Owner.

33.    **Modifications.** Except as otherwise set forth herein, this Subcontract cannot be changed, modified or otherwise varied except by written agreement signed by both parties hereto.

34.    **Applicable Law.** This Subcontract is deemed to be executed and delivered in the Pennsylvania and shall be constructed and enforced in accordance with the law thereof.

35.    **Severability.** It is believed that no provision of this Subcontract is contrary to or in violation of any federal or state law, but if it should be determined that there is a provision hereof that is in conflict with any such law or regulation, then such provision shall continue only to the extent permitted. In the event any provision of this Subcontract is thus held inoperative, the remaining provisions shall, nevertheless, remain in full force and effect.

36.    **Headings.** The headings for each paragraph of this Subcontract form no part of this Subcontract and are inserted solely for convenience.

37.    List of Exhibits:

| | |
|---|---|
| Exhibit A: | Redacted Master Contract with Owner dated |
| Exhibit B: | Subcontractor Proposal Date 09/16/2024 |
| Exhibit C: | List of Contract Drawings, Specifications & Addenda |
| Exhibit D: | Vendor/Subcontractor List |
| Exhibit E: | Sample Insurance Certificate |
| Exhibit F: | W-9 Form (https://www.irs.gov/pub/irs-pdf/fw9.pdf ) |
| Exhibit G: | Subcontractor's Partial Certification & Release of Lien Waivers |
| Exhibit H: | N/A |
| Exhibit I: | Final Certification and Release of Liens for & Claims Waiver |
| Exhibit K: | Contractor Site Specific Safety Manual |

## Addenda

A.  The undersigned hereby acknowledges receipt of the following addenda which shall become part of the Contract Documents:

16

**Bulletin**

B.  The undersigned hereby acknowledges receipt of the following bulletin which shall become
part of the Contract Documents:


**IN WITNESS WHEREOF,** the parties have executed this Subcontract the day and year
first above written.

CONTRACTOR:                                        SUBCONTRACTOR Legal Name:

**CVM Construction Managers, Inc.**                **Dan Lepore & Sons**
**d/b/a CVMNEXT Construction**

By: _Sameh A Majid_                                By: _Gregory J Lepore_

Name: _Sameh A Majid_                              Name: _GREGORY J. LEPORE_

Title: _President_                                 Title: _PRESIDENT_

Date: _1/29/2025_                                  Date: _JANUARY 18, 2025_


**CLARIFICATION TO CVM SUBCONTRACT AGREEMENT** for Arch Street Methodist Church
Spire Rehabilitation as follows,
  - **Lepore's work and related qualifications and exclusions to Lepore's work shall only
    be as confirmed by Lepore in its proposal to CVM dated September 16, 2024, pages
    3 of 3 and CVM's "FORM OF BID" dated October 14, 2022, pages 00 4113-1 through
    and including 00 4113-5 that accompany and are a part of this Subcontract. NOTE!
    These documents are otherwise known as EXHIBIT B, which is referenced on pages
    2 and 16 of the Subcontract Agreement.**
  - **List of drawings and specs are those documents received by Lepore in an email
    from CVM dated July 8, 2024. There are no Addenda nor Bulletins contained in this
    email. NOTE! These documents are otherwise known as EXHIBIT C, which is
    referenced on page 16 of the Subcontract Agreement.**
  - **While referenced on pages 2 and 16 of the Subcontract Agreement, Lepore does not
    have a copy of the executed Principal Contract between CVM and the Owner. Lepore
    otherwise trusts that CVM has determined that the Owner has sufficient funds set
    aside to pay for work performed by Lepore.**

17

# DAN LEPORE & SONS COMPANY

**501 WASHINGTON STREET, CONSHOHOCKEN, PENNSYLVANIA   19428**
**TEL: (610) 940-9888**                                    **FAX: (610) 834-9226**

September 16, 2024

Mr. Ray Davis
CVMNEXT Construction
1002 Ninth Ave.
King of Prussia, PA 19406

RE: Arch Street United Methodist Church
Bid Proposal

Dear Ray,

We are pleased to submit the following proposal for the above-referenced project. The pricing is inclusive of all materials, manpower, tools, and supervision necessary to perform the following scope being proposed upon. Our Lump Sum Price to complete Lepore's In-scope Base Quantities and In-scope Allowance Quantities is: **One Million One Hundred Ninety-Three Thousand Dollars ($ 1,193,000.00) .**

### In-scope Base Quantities:

1. Drawing FR2.0: M11 Repoint Brick -Backup **(1,700 SF)**
2. Drawing FR2.0: M12 Brick Replacement **(20 SF)**
3. Drawing FR3.0, Detail 5: Removal of Containment Netting & Patch Anchor Holes
4. Drawing FR3.1: M1 Repoint Marble **(4,405 SF)**
5. Drawing FR3.1: G1 Wall Grouting Void Span **(300 SF)**
6. Drawing FR3.1: M13 Steel Rod **(4 Locations)**
7. Drawing FR3.1: M7 Buttress Reconstruction **(4 Locations)**
8. Drawing FR3.1: M9 Trefoil brick infills **(20 Locations)**
9. Drawing FR3.1: Type R1 Marble Replacement **(30 PCS)**
10. Drawing FR3.1: Type R2 Marble Replacement **(40 PCS)**
11. Drawing FR3.1: Type R3 Marble Allowance **(30 PCS)**
12. Drawing FR3.1: Type R4 Marble Replacement **(5 PCS)**
13. Drawing FR3.1: Type R5 Marble Replacement **(1 PCS)**
14. Drawing FR3.2: M8 Finial Reconstruction **(3 Locations)**
15. Drawing FR3.2: M15 Stair Repairs (1-North & 1-West) **(2 Locations)**

Page 1 of 3

September 16, 2024
Page 2 of 3

### In-scope Allowance Quantities:

| | |
|---|---|
| 1. M1 Repoint Marble | **1,610 SF.** |
| 2. M2 Marble Patch | **150 SF** |
| 3. M3 Marble Dutchman | **50 PCS** |
| 4 M4A.Marble Roll Pinning | **75 PCS** |
| 5. M4B Marble Panel Stabilization Pinning | **35 PCS** |
| 6. M5 Marble Exfoliation | **1,626 SF** |
| 7.M6 Marble Roll Anchor Replacement | **50 PCS** |
| 8. M6A Marble Roll Patching | **100 PCS** |
| 9.M6B Marble Roll Dutchman | **25 PCS** |
| 9.M10 Crack Injection | **157 LF** |
| 10.M11 Repoint Back -Up | **150 SF** |
| 11, M12 Brick Replacement | **150 SF** |
| 12 M14 Helical Bed Joint Reinforcing | **30 PCS** |
| 13.RI Type 1 Roll | **27 PCS** |
| 14,R2 Type 2 Roll | **31 PCS** |
| 15. R3 Type 3 Roll | **15 PCS** |
| 16.R4 Type 4 Roll | **5 PCS** |
| 17 R6 Type 6 Rectangular Panel | **100 SF** |
| 18.G1 Wall Grouting | **50 SF** |
| 19.S1 Armored Joint Installation | **100 LF** |

### Add Alternate: C1 Cleaning Marble          10,840 SF

The price to complete Alternate 1, C1 Cleaning Marble is **Forty-Two Thousand Three Hundred Dollars ($43,300.00).**

### Unit Pricing:

| | |
|---|---|
| U-M1 Repoint Marble | **$ 28.00  SF** |
| U-M2 Marble Repair- Patch | **$ 125.00  SF** |
| U-M3 Marble Repair- Dutchman | **$ 495.00 EA** |
| U-M4A Marble Roll Stabilization -Pinning | **$ 175.00 EA** |
| U-M4B Marble Panel Stabilization – Pinning | **$ 200.00 EA** |
| U-M5 Marble Exfoliation | **$ 25.00 SF** |
| U-M6 Marble Roll Anchor Replacement | **$ 125.00 EA** |
| U- M6A Marble Roll Patching | **$ 125.00 EA** |
| U- M6B Marble Roll Dutchman | **$ 500.00 EA** |
| U- M10 Crack Injection | **$ 175.00 LF** |
| U- M11 Repoint -Brick Back-up | **$ 25.00 SF** |
| U-M12 Brick Replacement | **$ 350.00 SF** |
| U- M14 Helical Bed Joint Reinforcing | **$ 125.00 LF** |
| U-R1 Marble Replacement Type 1 – Roll | **$ 1,470.00 EA** |
| U-R2 Marble Replacement Type 2- Roll | **$ 1,700.00 EA** |
| U-R3 Marble Replacement Type 3 – Roll | **$ 2,125.00 EA** |
| U-R4 Marble Replacement Type 4 – Roll | **$ 3,000.00 EA** |
| U- R6 Marble Replacement Type 6 Panel | **$ 600.00 SF** |
| U-G1 Wall Grouting (Void Span) | **$ 195.00 SF** |
| U- S1 Armored Joint Installation | **$ 61.00 LF** |

September 16, 2024
Page 3 of 3

**Exclusions to this Proposal:**

1. Dumpsters for removal of rubbish and toilets (Note! By Others)
2. Removal or remediation of hazardous materials.
3. Inspection, testing and or Testing Agency field activities including test specimens.
4. Flashing. (Note! By Others)
5. Scaffolding and or moving of planking, outriggers, etc. (Note! By Others)
6. 1000 lb. hoist and operator (Note! By Others)
6. Pedestrian and sidewalk protection or street closures. (Note! By Others)
7. Winter Protection or heated enclosures. (Note! By Others)
8. Electrical power and potable water. (Note! By Others)
9 Overtime, premium time, or shift work.
10 Payment & performance bonds and or bid bonds.
11. Delegated design and or design assist.
12. Engineering and or design of any back up construction required. (Note! By Others)
13. Furnish and install backup construction shown or required. (Note! By Others)
14. Lighting Protection. (Note! By Others)
15. Window Restoration. (Note! By Others)
16. Shoring. (Note! By Others) **(Note: Upon receipt of a prescriptive design and details for the Shoring/Bracing of the Marble Buttress units shown on drawing FR4.0, Lepore plans to provide a price for this shoring)**

**Qualifications:**

- This bid proposal assumes Lepore will start work on March 1, 2025 and be substantially completed by December 1, 2025.
- The option to engage certain unit pricing for added work needs to occur on a timely basis while Lepore is mobilized at each area but no later than June 1, 2025 to allow for material procurement and installation well before December 1, 2025.
- Engagement of large quantities of added work especially including unit pricing may precipitate the need to extend the schedule beyond December 1, 2025 and into cold weather for which Lepore has no cost considerations in this proposal.
- Scaffolding and access by others must be 'masons scaffolding' with a minimum continuous 2-plank outrigger for the masons installing the work and adjacent planked decks for materials / storage.
- This bid proposal assumes 8-hour days from 7am to 3:30pm with ½ hour lunch break.

We look forward to successfully collaborating with you on this project. Should you have any questions please do not hesitate to contact me

Thank You,
Gino Varacalli
Estimator
Mobile phone # 610-960-5171

ISSUED FOR BID
October 14, 2022

## FORM OF BID

Name of Project: Arch Street United Methodist Church – Spire Rehabilitation Program

CVM Project No.: E17.040H

Bids may be submitted via email. A hardcopy bid, matching exactly the electronic, must be submitted, in a sealed envelope, within 24 hours of time of bid to:

Mr. Robin Hynicka
Arch Street United Methodist Church
1344 Arch Street
Philadelphia, PA 19107
robin@archstreetumc.org

A copy shall be faxed or emailed to:
Mr. Kevin Coll
CVM
Tel: (610) 989-3800
Fax: (610) 989-3677
kcoll@cvmprofessional.com

The undersigned hereby proposes to furnish all materials and perform all of the Work for completion of the Project as shown on the Drawings, described in the Special Conditions, Addenda, if any, or as referred to in the "Instructions to Bidders" for the following amounts:

*Bid Amount is to be inclusive of all costs associated with performing the work as identified on the drawings including but not limited to, general conditions of the work, temporary protections, overhead and profit.*

BASE

| Item(s) | Work Scope Description | Reference Detail | Bid Quantity | Unit Price ($/Unit) | Bid Amount ($) |
|---------|------------------------|------------------|--------------|---------------------|----------------|
| - | Mobilization and temporary controls | - | 1 EA | - | $ |
| - | Access | - | 1 EA | - | $ |
| - | General Conditions | - | 1 EA | - | $ |
| - | Permit Fees (ALLOWANCE) | - | 1 EA | - | $ |
| M1 | Repoint Marble | A/FR4.3 | 4,405 SF | $ 28.00 | $ 123,340.00 |
| M2 | Marble Repair - Patch | D/FR4.3 | 0 | $ | $ |
| M3 | Marble Repair - Dutchman | E/FR4.3 | 0 | $ | $ |
| M4A | Marble Roll Stabilization - Pinning | 2/FR4.1 | 0 | $ | $ |
| M4B | Marble Panel Stabilization - Pinning | J/FR4.3 | 0 | $ | $ |
| M5 | Marble Exfoliation | H/FR4.3 | 0 | $ | $ |
| M6 | Marble Roll Anchor Replacement | 5/FR4.1 | 0 | $ | $ |

ARCH STREET UNITED METHODIST CHURCH
SPIRE REHABILITATION PROGRAM

FORM OF BID
00 4113 - 1

**ISSUED FOR BID**
**October 14, 2022**

| Item(s) | Work Scope Description | Reference Detail | Bid Quantity | Unit Price ($/Unit) | Bid Amount ($) |
|---|---|---|---|---|---|
| M6A | Marble Roll Patching | 6/FR4.1 | 0 | $ | $ |
| M6B | Marble Roll Dutchman | E/FR4.3 | 0 | $ | $ |
| M7 | Buttress Reconstruction | 1/FR4.0 | 4 EA | $ 39,000 | $ 156,000.00 |
| M8 | Finial Reconstruction | 2/FR4.0 | 3 EA | $ 30,700 | $ 92,100.00 |
| M9 | Trefoil Repair | 7/FR4.2 | 20 EA | $ 2,900 | $ 58,000.00 |
| M10 | Crack Injection | F/FR4.3 | 33 LF | $ 174.00 | $ 5,742.00 |
| M11 | Repoint - Brick Backup | A/FR4.3 | 1,700 SF | $ 22.00 | $ 37,400.00 |
| M12 | Brick Replacement | L/FR4.3 | 20 SF | $ 342.00 | $ 6,840.00 |
| M13 | Steel Rod | 6/FR4.2 | 4 EA | $1,475 | $ 5,900.00 |
| M14 | Helical Bed Joint Reinforcing | G/FR4.3 | 0 | $ | $ |
| M15 | Entry Stair Repairs | FR3.2 | 0 | - | $ |
| R1 | Marble Replacement: Type 1 – Roll | 1/FR4.1 | 30 EA | $ 1,470 | $ 44,100.00 |
| R2 | Marble Replacement: Type 2 - Roll | 1/FR4.1 | 40 EA | $ 1,700 | $ 68,000.00 |
| R3 | Marble Replacement: Type 3 - Roll | 1/FR4.1 | 30 EA | $ 2,125 | $ 63,750.00 |
| R4 | Marble Replacement: Type 4 - Roll | 1/FR4.1 | 5 EA | $ 3,100 | $ 15,500.00 |
| R5 | Marble Replacement: Type 5 - Wood Roll | 3/FR4.1 | 1 EA | $ 2,900 | $ 2,900.00 |
| R6 | Marble Replacement: Type 6 – Rect. Panel | 7/FR4.1 | 0 | $ | $ N/A |
| G1 | Wall Grouting (Void Span) | K/FR4.3 | 300 SF | $195.00 | $ 58,500.00 |
| S1 | Armored Joint Installation | C/FR4.3 | 0 | $ | $ N/A |
| W1 | Window Rehabilitation (Type 1) | 1/W1.0 | 12 EA | $ | $ N/A |
| W1A | Window Rehabilitation (Type 1) | 1/W1.0 | 8 EA | $ | $ N/A |
| W2 | Window Rehabilitation (Type 2) | 2/W1.0 | 4 EA | $ | $ N/A |
| E1 | Lightning Protection System | -- | 1 EA | $ | $ N/A |
| B1 | Buttress Shoring/Bracing | 1/FR4.0 | 4 EA | $ | $ N/A |
| -- | Rainwater Conductor Relocation | 5/W1.0 | 1 EA | -- | $ N/A |
| | | | | **BASE TOTAL** | $ 738,072.00 |

ISSUED FOR BID
October 14, 2022

ALLOWANCES

| Item(s) | Work Scope Description | Reference Detail | Allowance Quantity | Unit Price ($/Unit) | Bid Amount ($) |
|---------|------------------------|------------------|--------------------|--------------------|--------------------|
| A-M1 | Repoint Marble | A/FR4.3 | 1,610 SF | $ 28.00 | $ 45,080.00 |
| A-M2 | Marble Repair – Patch | D/FR4.3 | 150 SF | $125.00 | $ 18,750.00 |
| A-M3 | Marble Repair - Dutchman | E/FR4.3 | 50 EA | $250.00 | $ 12,500.00 |
| A-M4A | Marble Roll Stabilization - Pinning | 2/FR4.1 | 75 EA | $175.00 | $ 13,125.00 |
| A-M4B | Marble Panel Stabilization - Pinning | J/FR4.3 | 35 EA | $200.00 | $ 7,000.00 |
| A-M5 | Marble Exfoliation | H/FR4.3 | 1,626 SF | $ 25.00 | $ 40,650.00 |
| A-M6 | Marble Roll Anchor Replacement | 5/FR4.1 | 50 EA | $125.00 | $ 6,250.00 |
| A-M6A | Marble Roll Patching | 6/FR4.1 | 100 EA | $125.00 | $ 12,250.00 |
| A-M6B | Marble Roll Dutchman | E/FR4.3 | 25 EA | $250.00 | $ 6,250.00 |
| A-M10 | Crack Injection | F/FR4.3 | 157 LF | $175.00 | $ 27,475.00 |
| A-M11 | Repoint - Brick Backup | A/FR4.3 | 150 SF | $ 25.00 | $ 3,750.00 |
| A-M12 | Brick Replacement | L/FR4.3 | 150 SF | $350.00 | $ 52,500.00 |
| A-M14 | Helical Bed Joint Reinforcing | G/FR4.3 | 30 EA | $125.00 | $ 3,750.00 |
| A-R1 | Marble Replacement: Type 1 – Roll | 1/FR4.1 | 27 EA | $1,470 | $ 39,690.00 |
| A-R2 | Marble Replacement: Type 2 - Roll | 1/FR4.1 | 31 EA | $ 1,700 | $ 52,700.00 |
| A-R3 | Marble Replacement: Type 3 - Roll | 1/FR4.1 | 15 EA | $ 2,125 | $ 31,875.00 |
| A-R4 | Marble Replacement: Type 4 - Roll | 1/FR4.1 | 5 EA | $ 3,100 | $ 15,500.00 |
| A-R6 | Marble Replacement: Type 6 – Rect. | 7/FR4.1 | 100 SF | $ 500.00 | $ 50,000.00 |
| A-G1 | Wall Grouting (Void Span) | K/FR4.3 | 50 SF | $ 195.00 | $ 9,750.00 |
| A-S1 | Armored Joint Installation | C/FR4.3 | 100 LF | $ 61.00 | $ 6,100.00 |

ALLOWANCES (Cont.)

ARCH STREET UNITED METHODIST CHURCH
SPIRE REHABILITATION PROGRAM

FORM OF BID
00 4113 - 3

ISSUED FOR BID
October 14, 2022

| Item(s) | Work Scope Description | Reference Detail | Allowance Quantity | Unit Price ($/Unit) | Bid Amount ($) |
|---------|------------------------|------------------|--------------------|--------------------|----------------|
| W-FR | Window Frame Dutchman | W1.0 | 30 LF | $ | $  N/A |
| W-SA | Window Sash Dutchman | W1.0 | 30 LF | $ | $  N/A |
| W-TR.1 | Window Trim (Type 1 — Exterior) | W1.0 | 100 LF | $ | $  N/A |
| W-TR.2 | Window Trim (Type 2 — Exterior) | W1.0 | 30 LF | $ | $  N/A |
| W-TR.3 | Window Trim (Type 1 — Interior) | W1.0 | 200 LF | $ | $  N/A |
| W-GL | Windowpane Replacement (Type 1) | W1.0 | 5 EA | $ | $  N/A |
| | | | | ALLOWANCE TOTAL | $454,945.00 |

BID SUMMARY

| ID | BID SUMMARY | BID AMOUNT |
|----|-------------|------------|
| 1 | BASE BID TOTAL | $  738,072.00 |
| 2 | ALLOWANCE BID TOTAL | $  454,945.00 |
| | PROGRAM BID TOTAL | $  1,193,017.00 |

ALTERNATES

| Item(s) | Work Scope Description (Detail Reference) | Bid Quantity | Bid Amount ($) |
|---------|-------------------------------------------|--------------|----------------|
| ALT-1 | Cleaning of Marble Façade | 10,840 SF | $  42,256.00 |
| | | | |

ARCH STREET UNITED METHODIST CHURCH
SPIRE REHABILITATION PROGRAM

FORM OF BID
00 4113 – 4

ISSUED FOR BID
October 14, 2022

UNIT PRICING
Unit pricing will be used for changes in project quantities.

*Unit Price is to be inclusive of all costs associated with performing the work as identified on the drawings including but not limited to, general conditions of the work, temporary protections, overhead and profit.*

| Bid Item | Repair Description | Reference Detail | Unit | Unit Price ($) |
|----------|-------------------|------------------|------|----------------|
| U-M1 | Repoint Marble | A/FR4.3 | SF | $ 28.00 |
| U-M2 | Marble Repair - Patch | D/FR4.3 | SF | $ 125.00 |
| U-M3 | Marble Repair - Dutchman | E/FR4.3 | EA | $ 495.00 |
| U-M4A | Marble Roll Stabilization - Pinning | 2/FR4.1 | EA | $ 175.00 |
| U-M4B | Marble Panel Stabilization - Pinning | J/FR4.3 | EA | $ 200.00 |
| U-M5 | Marble Exfoliation | H/FR4.3 | SF | $ 25.00 |
| U-M6 | Marble Roll Anchor Replacement | 5/FR4.1 | EA | $ 125.00 |
| U-M6A | Marble Roll Patching | 6/FR4.1 | EA | $ 125.00 |
| U-M6B | Marble Roll Dutchman | E/FR4.3 | EA | $ 500.00 |
| U-M10 | Crack Injection | F/FR4.3 | LF | $ 175.00 |
| U-M11 | Repoint - Brick Backup | A/FR4.3 | SF | $ 25.00 |
| U-M12 | Brick Replacement | L/FR4.3 | SF | $ 350.00 |
| U-M14 | Helical Bed Joint Reinforcing | G/FR4.3 | EA | $ 125.00 |
| U-R1 | Marble Replacement: Type 1 - Roll | 1/FR4.1 | EA | $ 1,470.00 |
| U-R2 | Marble Replacement: Type 2 - Roll | 1/FR4.1 | EA | $ 1,700.00 |
| U-R3 | Marble Replacement: Type 3 - Roll | 1/FR4.1 | EA | $ 2,125.00 |
| U-R4 | Marble Replacement: Type 4 - Roll | 1/FR4.1 | EA | $ 3,000.00 |
| U-R6 | Marble Replacement: Type 6 - Rectangular Panel | 7/FR4.1 | SF | $ 600.00 |
| U-G1 | Wall Grouting (Void Span) | K/FR4.3 | SF | $ 195.00 |
| U-S1 | Armored Joint Installation | C/FR4.3 | LF | $ 61.00 |

# **EXHIBIT B**

Schedule of Values

**rgreenbaum@karalislaw.com**

| | |
|---|---|
| **From:** | Gino Varacalli <gino@danlepore.com> |
| **Sent:** | Wednesday, December 24, 2025 9:08 AM |
| **To:** | Kevin S. Coll; Donald P. Scholz |
| **Cc:** | Greg Lepore; Tracy Gatti |
| **Subject:** | December SOV |
| **Attachments:** | Final December 24,2024 SOV_ (002).xlsx |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

To all,

Here is the approved schedule of Values that we discussed for December. Greg Lepore Sr will be taking over the project, if you have any questions, please contact Greg Lepore Sr .As we discussed we will need change orders 1 & 2 to proceed . If you have any billing questions, please contact Tracy Gatti.


I wish all a Merry Christmas and Happy New Year,

Gino Varacalli
Dan Lepore & Sons
501 Washington Street, Suite 2
Conshohocken, PA 19428
(p) 610-940-9888 ext:117
(f)  610-834-9226
Cell:610-960-5171

**www.danlepore.com**



PROJECT: Arch Street United Methodist  Church Spire Rehabilitation
LOCATION: Philadelphia PA
Engineer: Kevi Coll
JOB NO.: 25-003
CONTRACTOR: DAN LEPORE & SONS COMPANY
ADDRESS: 501 WASHINGTON STREET, SUITE 2
CONSHOHOCKEN, PA 19428

**SCHEDULE OF VALUES**

**12/24/2025**

| ITEM # | BASE BID DESCRIPTION OF WORK | SCHEDULED VALUE | % COMPLETE TO DATE | AMOUNT BILLED TO DATE | AMOUNT PREVIOUSLY | BALANCE TO COMPLETE | |
|---|---|---|---|---|---|---|---|
| 1 | M1 Repoint Marble ( 4,405 SF) | $ 123,340.00 | 100% | $ 123,340.00 | $ - | $ - | |
| 2 | M7 Buttress Reconstruction (4 EA) | $ 156,000.00 | 0% | $ - | $ - | $ - | |
| 3 | M8 Finial Reconstruction (3EA) | $ 92,100.00 | 0% | $ - | $ - | $ - | |
| 4 | M9 Trefoil Repair (20EA) | $ 58,000.00 | 95% | $ 55,100.00 | $ - | $ - | |
| 5 | M10 Crack Injection (33LF) | $ 5,742.00 | 0% | $ - | $ - | $ - | |
| 6 | M11 Repoint- Brick Backup ( 1,700 SF) | $ 37,400.00 | 100% | $ 37,400.00 | $ - | $ - | |
| 7 | M12 Brick Replacement (20 SF) (120 PCS) | $ 6,840.00 | 100% | $ 6,840.00 | $ - | $ - | |
| 8 | M13 Steel Rod (4EA) | $ 5,900.00 | 0% | $ - | $ - | $ - | |
| 9 | R1 Marble Replacement Type 1-Roll (30 Rolls)   ( 30 Rolls) | $ 44,100.00 | 50% | $ 22,050.00 | $ - | $ - | |
| 10 | R2 Marble Replacement Type 2-Roll (40 EA)   ( 38 Rolls) | $ 68,000.00 | 47.5% | $ 32,300.00 | $ - | $ - | Potential Credit Unbilled $3,400.00 |
| 11 | R3 Marble Replacement Type 3-Roll ( 30 EA)   (14 Rolls) | $ 63,750.00 | 23.3% | $ 14,872.88 | $ - | $ - | Potential Credit Unbilled $33,999.79 |
| 12 | R4 Marble Replacement Type 4-Roll (5 EA)   (1 Roll) | $ 15,500.00 | 10% | $ 1,550.00 | $ - | $ - | Potential Credit Unbilled $12,400.00 |
| 13 | R5 Marble Replacement Type 5-Roll ( 1 EA)   (1 Roll) | $ 2,900.00 | 50% | $ 1,450.00 | $ - | $ - | |
| 14 | G1 Wall Grouting ( Void Span 300 SF) | $ 58,500.00 | 0% | $ - | $ - | $ - | Potential Credit when we determine pricing from Void Span Grout |
| | TOTAL BASE CONTRACT | $ 738,072.00 | 0% | $ 294,902.88 | $ - | $ - | |

| ITEM # | ALLOWANCES  DESCRIPTION OF WORK | SCHEDULED VALUE | % COMPLETE TO DATE | AMOUNT BILLED TO DATE | AMOUNT PREVIOUSLY | BALANCE TO COMPLETE | |
|---|---|---|---|---|---|---|---|
| 1 | A-M1 Repoint Marble ( 1,610 SF) | $ 45,080.00 | 0% | $ - | $ - | $ - | |
| 2 | A-M2 Marble- Patch ( 150 SF) | $ 18,750.00 | 0% | $ - | $ - | $ - | |
| 3 | A-M3 Marble -Dutchman (50 PCS) | $ 12,500.00 | 0% | $ - | $ - | $ - | |
| 4 | A-M4A Marble Roll Stabilization -Pinning ( 75 EA) 51 EA | $ 13,125.00 | 68% | $ 8,925.00 | $ - | $ - | |
| 5 | A- M4B Marble Panel Stabilization- Pinning ( 35 EA) | $ 7,000.00 | 0% | $ - | $ - | $ - | |
| 6 | A-M5 Marble Exfoliation( 1,626 SF) | $ 40,650.00 | 0% | $ - | $ - | $ - | |
| 7 | A- M6 Marble Roll Anchor Replacement (50 EA) | $ 6,250.00 | 0% | $ - | $ - | $ - | |
| 8 | A- M6A Marble Roll Patching (100 EA) | $ 12,250.00 | 0% | $ - | $ - | $ - | |
| 9 | A- M6B Marble Roll Dutchman (25 EA) | $ 6,250.00 | 0% | $ - | $ - | $ - | |
| 10 | A- M10 Crack Injection ( 157 lf) | $ 27,475.00 | 0% | $ - | $ - | $ - | |
| 11 | A-M11 Repoint Brick Back Backup ( 150 SF)( 2S SF) | $ 3,750.00 | 17% | $ 626.25 | $ - | $ - | |
| 12 | A-M12 Brick Replacement (150 SF) 103 SF (620 PCS) | $ 52,500.00 | 69% | $ 36,015.00 | $ - | $ - | |
| 13 | A-M14 Helical Bed Joint Reinforcing ( 30 EA) | $ 3,750.00 | 0% | $ - | $ - | $ - | |
| 14 | A-R1 Marble Replacement Type 1-Roll ( 27 EA)     (9 Rolls) | $ 39,690.00 | 16.5% | $ 6,548.85 | $ - | $ - | Potential Credit Unbilled $ 26,460.00 |
| 15 | A-R2 Marble Replacement Type 2-Roll ( 31 EA) | $ 52,700.00 | 0% | $ - | $ - | $ - | Potential Credit Unbilled $ 52,700.00 |
| 16 | A-R3 Marble Replacement Type 3-Roll ( 15 EA) | $ 31,875.00 | 0% | $ - | $ - | $ - | Potential Credit Unbilled $ 31,875.00 |
| 17 | A-R4 Marble Replacement Type 4 -Roll ( 5 EA) | $ 15,500.00 | 0% | $ - | $ - | $ - | Potential Credit Unbilled $ 15,500.00 |
| 18 | A-R6Marble Replacement Type 6 -RECT ( 100 SF) | $ 50,000.00 | 0% | $ - | $ - | $ - | Potential Credit  here, not surveyed yet. TBD |
| 19 | A-G1 Wall Grouting ( Void Span 50 SF) | $ 9,750.00 | 0% | $ - | $ - | $ - | Potential credit when we determine pricing from Void Span Grout |
| 20 | A-S1 Armored Joint Installation ( 100 Lf) | $ 6,100.00 | 0% | $ - | $ - | $ - | |
| | TOTAL ALLOWANCE CONTRACT | $ 454,945.00 | 0% | $ 52,115.10 | $ - | $ - | |

| ITEM # | CHANGE ORDER # 1  DESCRIPTION OF WORK | SCHEDULED VALUE | % COMPLETE TO DATE | AMOUNT BILLED TO DATE | AMOUNT PREVIOUSLY | BALANCE TO COMPLETE | |
|---|---|---|---|---|---|---|---|
| 1 | M6C- Marble Roll # 1 Full Length Replacement ( 11 PCS ) | $ 16,170.00 | 0% | $ - | $ - | $ - | Change Order # 1 |
| 2 | M6C- Marble Roll # 2 Full Length Replacement ( 25 PCS ) | $ 42,500.00 | 0% | $ - | $ - | $ - | Change Order # 1 |
| 3 | M6C- Marble Roll # 3 Full Length Replacement ( 5 PCS) | $ 10,625.00 | 0% | $ - | $ - | $ - | Change Order # 1 |
| | TOTAL CHANGE ORDER #1 | $ 69,295.00 | 0% | $ - | $ - | $ - | Total Change Order #1 |

| ITEM # | CHANGE ORDER #2  DESCRIPTION OF WORK | SCHEDULED VALUE | % COMPLETE TO DATE | AMOUNT BILLED TO DATE | AMOUNT PREVIOUSLY | BALANCE TO COMPLETE | |
|---|---|---|---|---|---|---|---|
| 1 | M6B- Marble Roll R1  Partial Dutchman ( 14 PCS ) | $ 14,000.00 | 0% | $ - | $ - | $ - | Change Order # 2 |
| 2 | M6B- Marble Roll R2  Partial Dutchman ( 14 PCS ) | $ 20,020.00 | 0% | $ - | $ - | $ - | Change Order # 2 |
| 3 | M6B- Marble Roll R3  Partial Dutchman ( 4 PCS ) | $ 7,420.00 | 0% | $ - | $ - | $ - | Change Order # 2 |
| 4 | M6B- Marble Roll R4  Partial Dutchman ( 4PCS ) | $ 10,120.00 | 0% | $ - | $ - | $ - | Change Order # 2 |
| | TOTAL CHANGE ORDER # 2 | $ 51,560.00 | 0% | $ - | $ - | $ - | Total Change Order # 2 |

# **<u>EXHIBIT C</u>**

Site Observation Report No. 11



cvm

1002 west 9th Avenue
King of Prussia, Pa 19406
610.989.3800
cvmprofessional.com

# Site Observation Report #11

| | |
|---|---|
| **Project Name:** | ASUMC Spire Rehabilitation Program |
| **Project No.:** | E17.040H |
| **Date of Report:** | November 25, 2025 |
| **Date of Visit(s):** | November 25, 2025 |
| **Weather/Air:** | Overcast, 45 ºF |
| **People met:** | Mike McKain (CVM Construction) |
| **Reported by:** | Kevin Coll, CVM |

Kevin Coll of CVM visited the site to observe the general progress, conformance with the design intent and quality of the work. The following observations were made:

| OBSERVATIONS | | |
|---|---|---|
| **Item no.** | **Item Description** | |
| 11.1 | <u>Progress</u>:<br>Lepore continues to work on both the interior and exterior of the spire. The interior brick replacement is nearing completion. | |

| 11.2 | <u>Marble Roll Mock-Up (Previous CVM SOR Item 10.3):</u> Samples of the new marble rolls were reviewed on site. The size, finish and tooling of the newly fabricated roll is a good match for the original parent stone material (note – the original / adjoining marble rolls in figure 1 are patinaed with age/have some atmospheric soiling that are resulting in the more buff appearance). The alternate to clean the façade has not been approved at this time but may be re-evaluated as the project progressed. Additional comments on the mockup include: |  |
|---|---|---|

- Care should be taken to locate the anchoring dowels at ¼ points or 2 ½" from the ends of the stone.
- Take care to maintain a 3/8" - 1/2" bed joint between top and bottom units.
- The Hilti adhesive being utilized to set the dowels was slow to set due to lowering temperatures, an alternate quick set Hilti adhesive system may be desirable.

   Post-Meeting Note: The Hilti Hit HY 200 anchoring system has been proposed for use. CVMPro takes no exception to this product. A formal substitution request submittal will be processed through Procore to document this change.

*Figure 1: Replacement Roll Mockup (Anchored)*

*Nov 25, 2025 Update: The marble sample has been anchored into place as the next step in the mockup. The anchor installation appears to meet the design intent of the program documents. As this is a "loose" face mounted roll course the bed joints on all three sides are to be fully set in mortar to finish the installation. As noted above, care should be taken verify all joints are properly sized, the mock-up is on the upper end of the allowable limit. Note that alternating roll courses that were originally set back into the spire masonry are to be set in a full bed of stone adhesive on the rear face (red arrow), refer to sketch SK-4 issued 10/8/2025.*



*Figure 2: Replacement Roll Mockup (Anchored)*

If this does not agree with your understanding or you have any questions, please respond in writing within five (5) days upon receipt of this report.

**prepared by**    CVM
**copy to**    CVM Construction, Robin Hynick (ASUMC), Russ Alexander (ASUMC)

# __EXHIBIT D__

Payment Application 2



# AIA Document G702™ – 1992

## Application and Certificate for Payment

| | | |
|---|---|---|
| TO OWNER: | CVM Next Construction<br>1002 West 9th Avenue<br>King of Prussia, PA 19406 | PROJECT: Arch St. United Methodist |

| | |
|---|---|
| FROM CONTRACTOR: | DAN LEPORE & SONS CO. VIA ARCHITECT:<br>501 WASHINGTON STREET, STE.<br>CONSHOHOCKEN, PA 19428 |

APPLICATION NO: **2**
PERIOD TO: **11-30-2025**
CONTRACT FOR:
CONTRACT DATE:
PROJECT NOS: 25-003

Distribution to:
OWNER [ ]
ARCHITECT [ ]
CONTRACTOR [ ]
FIELD [ ]
OTHER [ ]

## CONTRACTOR'S APPLICATION FOR PAYMENT

Application is made for payment, as shown below, in connection with the Contract.
AIA Document G703™, Continuation Sheet, is attached.

| | | |
|---|---|---|
| 1. ORIGINAL CONTRACT SUM | $ | 1,193,017.00 |
| 2. NET CHANGE BY CHANGE ORDERS | $ | 0.00 |
| 3. CONTRACT SUM TO DATE (Line 1 ± 2) | $ | 1,193,017.00 |
| 4. TOTAL COMPLETED & STORED TO DATE (Column G on G703) | $ | 308,272.10 |
| 5. RETAINAGE: | | |
| a. *10%* on Completed Work (Columns D + E on G703) | $ 30,827.22 | |
| b. % of Stored Material (Column F on G703) | $ | |
| Total Retainage (Lines 5a + 5b, or Total in Column I of G703) | $ | 30,827.22 |
| 6. TOTAL EARNED LESS RETAINAGE (Line 4 minus Line 5 Total) | $ | 277,444.88 |
| 7. LESS PREVIOUS CERTIFICATES FOR PAYMENT (Line 6 from prior Certificate) | $ | 174,915.08 |
| 8. CURRENT PAYMENT DUE | $ | 102,529.80 |
| 9. BALANCE TO FINISH, INCLUDING RETAINAGE (Line 3 minus Line 6) | $ | 915,572.12 |

| CHANGE ORDER SUMMARY | ADDITIONS | DEDUCTIONS |
|---|---|---|
| Total changes approved in previous months by Owner | $ | $ |
| Total approved this month | $ | $ |
| TOTAL | $ | $ |
| NET CHANGES by Change Order | | |

The undersigned Contractor certifies that to the best of the Contractor's knowledge, information and belief the Work covered by this Application for Payment has been completed in accordance with the Contract Documents, that all amounts have been paid by the Contractor for Work for which previous Certificates for Payment were issued and payments received from the Owner, and that current payment shown herein is now due.

CONTRACTOR: DAN LEPORE & SONS CO.

By: _Dan Lepore_  Date: **11-24-25**

State of: PA
County of: Montgomery
Subscribed and sworn to before me this **24th** day of **Nov** **25**
Notary Public: _____
My commission expires: 8-8-29

Commonwealth of Pennsylvania - Notary Seal
MARJORIE A HOUSER - Notary Public
Montgomery County
My Commission Expires August 8, 2029
Commission Number 1278338

## ARCHITECT'S CERTIFICATE FOR PAYMENT

In accordance with the Contract Documents, based on on-site observations and the data comprising this application, the Architect certifies to the Owner that to the best of the Architect's knowledge, information and belief the Work has progressed as indicated, the quality of the Work is in accordance with the Contract Documents, and the Contractor is entitled to payment of the AMOUNT CERTIFIED.

AMOUNT CERTIFIED ........................... $

(Attach explanation if amount certified differs from the amount applied. Initial all figures on this Application and on the Continuation Sheet that are changed to conform with the amount certified.)

ARCHITECT:

By: _____  Date: _____

This Certificate is not negotiable. The AMOUNT CERTIFIED is payable only to the Contractor named herein. Issuance, payment and acceptance of payment are without prejudice to any rights of the Owner or Contractor under this Contract.

CAUTION: You should sign an original AIA Contract Document, on which this text appears in RED. An original assures that changes will not be obscured.

AIA Document G702™ – 1992. Copyright © 1953, 1963, 1965, 1971, 1978, 1983 and 1992 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. Purchasers are permitted to reproduce ten (10) copies of this document when completed. To report copyright violations of AIA Contract Documents, e-mail The American Institute of Architects' legal counsel, copyright@aia.org.



# Document G703™ – 1992

## Continuation Sheet

AIA Document G702™ 1992, Application and Certificate for Payment, or G732™ 2009,
Application and Certificate for Payment, Construction Manager as Adviser Edition,
containing Contractor's signed certification is attached.
In tabulations below, amounts are in US dollars.
Use Column I on Contracts where variable retainage for line items may apply.

| APPLICATION NO: | 2 |
| APPLICATION DATE: | 11/24/2025 |
| PERIOD TO: | |
| ARCHITECT'S PROJECT NO: | 25-003 |

| A | B | C | D (WORK COMPLETED) | E | F | G | % | H | I |
|---|---|---|---|---|---|---|---|---|---|
| ITEM NO. | DESCRIPTION OF WORK | SCHEDULED VALUE | FROM PREVIOUS APPLICATION (D + E) | THIS PERIOD | MATERIALS PRESENTLY STORED (Not in D or E) | TOTAL COMPLETED AND STORED TO DATE (D+E+F) | (G ÷ C) | BALANCE TO FINISH (C - G) | RETAINAGE (If variable rate) |
| 1 | M1 Repoint Marble 4,405 SF | 123,340.00 | 61,670.00 | 37,002.00 | | 98,672.00 | 80.00 | 24,668.00 | 9,867.20 |
| 2 | M7 Buttress Reconstruction 4E | 156,000.00 | | | | | | 156,000.00 | |
| 3 | M8 Finial Reconstruction 4EA | 92,100.00 | | | | | | 92,100.00 | |
| 4 | M9 Trefoil Repair 20EA | 58,000.00 | | 55,100.00 | | 55,100.00 | 95.00 | 2,900.00 | 5,510.00 |
| 5 | M10 Crack Injection 33LF | 5,742.00 | | | | | | 5,742.00 | |
| 6 | M11 Repoint-Brick BU 1,700 SI | 37,400.00 | 33,680.00 | 1,870.00 | | 35,530.00 | 95.00 | 1,870.00 | 3,553.00 |
| 7 | M12 Brick Replace20SF 120P( | 6,840.00 | 6,840.00 | | | 6,840.00 | 100.00 | | 684.00 |
| 8 | M13 Steel Rod 4EA | 5,900.00 | | | | | | 5,900.00 | |
| 9 | R1 Marble Replc Type1-30 rolls | 44,100.00 | 22,050.00 | | | 22,050.00 | 50.00 | 22,050.00 | 2,205.00 |
| 10 | R2 Marble Replc Type2-40 rolls | 68,000.00 | 30,600.00 | | | 30,600.00 | 45.00 | 37,400.00 | 3,060.00 |
| 11 | R3 Marble Replc Type3-30 rolls | 63,750.00 | 13,706.25 | | | 13,706.25 | 21.50 | 50,043.75 | 1,370.63 |
| 12 | R4 Marble Replc Type4 5 Each | 15,500.00 | 1,550.00 | | | 1,550.00 | 10.00 | 13,950.00 | 155.00 |
| 13 | R5 Marble Replc Type5-1EA | 2,900.00 | 1,450.00 | | | 1,450.00 | 50.00 | 1,450.00 | 145.00 |
| 14 | G1 WI Grouting void span 300! | 58,500.00 | | | | | | 58,500.00 | |
| 16 | BASE BID DESCRIPTIONS | | | | | | | | |
| 20 | ALLOWANCES | | | | | | | | |
| 22 | A-M1 Repoint Marble 1,610 SF | 45,080.00 | | | | | | 45,080.00 | |
| 23 | A-M2 Marble Patch 150 SF | 18,750.00 | | | | | | 18,750.00 | |
| 24 | A-M3 Marble Dutchman 50 PC | 12,500.00 | | | | | | 12,500.00 | |
| 25 | A-M4A Marble Stab Pinning 75 | 13,125.00 | | | | | | 13,125.00 | |
| 26 | A-M4B Marble PanelPinning 35 | 7,000.00 | | | | | | 7,000.00 | |
| 27 | A-M5 Marble Exfoliat 1,626SF | 40,650.00 | | | | | | 40,650.00 | |
| 28 | A-M6 Marble RI Anchor Rpl 50I | 6,250.00 | | | | | | 6,250.00 | |
| 29 | A-M6A Marble RI Ptchg 100EA | 12,250.00 | | | | | | 12,250.00 | |
| 30 | A-M6B Marble RI Dutchman 25 | 6,250.00 | | | | | | 6,250.00 | |
| | GRAND TOTAL | | | | | | | | |

CAUTION: You should sign an original AIA Contract Document, on which this text appears in RED. An original assures that changes will not be obscured.

AIA Document G703™ – 1992. Copyright © 1963, 1965, 1966, 1967, 1970, 1978, 1983 and 1992 by The American Institute of Architects. All rights reserved. WARNING: This AIA™ Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA™ Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. Purchasers are permitted to reproduce ten (10) copies of this document when completed. To report copyright violations of AIA Contract Documents, e-mail The American Institute of Architects' legal counsel, copyright@aia.org.

 **Document G703™ – 1992**

## Continuation Sheet

AIA Document G702™–1992, Application and Certificate for Payment, or G732™–2009,
Application and Certificate for Payment, Construction Manager as Adviser Edition,
containing Contractor's signed certification is attached.
In tabulations below, amounts are in US dollars.
Use Column I on Contracts where variable retainage for line items may apply.

| | | | APPLICATION NO: | 2 |
| | | | APPLICATION DATE: | 11/24/2025 |
| | | | PERIOD TO: | |
| | | | ARCHITECT'S PROJECT NO: | 25-003 |

| A | B | C | D | E | F | G | % | H | I |
|---|---|---|---|---|---|---|---|---|---|
| | | | **WORK COMPLETED** | | MATERIALS PRESENTLY STORED (Not in D or E) | TOTAL COMPLETED AND STORED TO DATE (D+E+F) | (G ÷ C) | BALANCE TO FINISH (C - G) | RETAINAGE (If variable rate) |
| ITEM NO. | DESCRIPTION OF WORK | SCHEDULED VALUE | FROM PREVIOUS APPLICATION (D + E) | THIS PERIOD | | | | | |
| 31 | A-M10 Crack Injections 157 LF | 27,475.00 | | | | | | 27,475.00 | |
| 32 | A-M11 Repoint Brick BU150SF | 3,750.00 | | | | | | 3,750.00 | |
| 33 | A-M12 Brick Replacement 150 | 52,500.00 | 16,275.00 | 19,950.00 | | 36,225.00 | 69.00 | 16,275.00 | 3,622.50 |
| 34 | A-M14 Helical Bed Reinf 30EA | 3,750.00 | | | | | | 3,750.00 | |
| 35 | A-R1 Marble Repl Type1-RI 27 | 39,690.00 | 6,548.85 | | | 6,548.85 | 16.50 | 33,141.15 | 654.89 |
| 36 | A-R2Marble Repl Type2RI 31 | 52,700.00 | | | | | | 52,700.00 | |
| 37 | A-R3Marble Repl Type3RI 15E | 31,875.00 | | | | | | 31,875.00 | |
| 38 | A-R4Marble Repl Type4RI 5A | 15,500.00 | | | | | | 15,500.00 | |
| 39 | A-RGMarble Rpltype6 Rect 10C | 50,000.00 | | | | | | 50,000.00 | |
| 40 | A-G1 WI Grouting Void Span5C | 9,750.00 | | | | | | 9,750.00 | |
| 41 | A-S1 Armored Jnt Instl 100LF | 6,100.00 | | | | | | 6,100.00 | |
| | GRAND TOTAL | 1,193,017.00 | 194,350.10 | 113,922.00 | | 308,272.10 | 25.84 | 884,744.90 | 30,827.22 |

**CAUTION: You should sign an original AIA Contract Document, on which this text appears in RED. An original assures that changes will not be obscured.**

AIA Document G703™ – 1992. Copyright © 1963, 1965, 1966, 1967, 1970, 1978, 1983 and 1992 by The American Institute of Architects. All rights reserved. WARNING: This AIA™ Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA™ Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. Purchasers are permitted to reproduce ten (10) copies of this document when completed. To report copyright violations of AIA Contract Documents, e-mail The American Institute of Architects' legal counsel, copyright@aia.org.

# **<u>EXHIBIT E</u>**

Payment Application 3

# AIA Document G702™ – 1992

## Application and Certificate for Payment

| | | |
|---|---|---|
| TO OWNER: | CVM Next Construction | PROJECT: Arch St. United Methodist |
| | 1002 West 9th Avenue | |
| | King of Prussia, PA 19406 | |

APPLICATION NO:  *DRAFT*
PERIOD TO: 12-31-2025
CONTRACT FOR:

Distribution to:
OWNER ☐
ARCHITECT ☐
CONTRACTOR ☐
FIELD ☐
OTHER ☐

FROM CONTRACTOR: DAN LEPORE & SONS CO. VIA ARCHITECT:
501 WASHINGTON STREET, STE.
CONSHOHOCKEN, PA 19428

CONTRACT DATE:
PROJECT NOS: 25-003

## CONTRACTOR'S APPLICATION FOR PAYMENT

Application is made for payment, as shown below, in connection with the Contract.
AIA Document G703™, Continuation Sheet, is attached.

| | | |
|---|---|---|
| 1. ORIGINAL CONTRACT SUM | $ | 1,193,017.00 |
| 2. NET CHANGE BY CHANGE ORDERS | $ | 120,855.00 |
| 3. CONTRACT SUM TO DATE (Line 1 ± 2) | $ | 1,313,872.00 |
| 4. TOTAL COMPLETED & STORED TO DATE (Column G on G703) | $ | 346,170.10 |

5. RETAINAGE:
 a. 10% Completed Work
 (Columns D + E on G703) $ 34,617.02
 b. % of Stored Material
 (Column F on G703) $

Total Retainage (Lines 5a + 5b, or Total in Column I of G703) $ 34,617.02

| | | |
|---|---|---|
| 6. TOTAL EARNED LESS RETAINAGE | $ | 311,553.08 |
| (Line 4 minus Line 5 Total) | | |
| 7. LESS PREVIOUS CERTIFICATES FOR PAYMENT | $ | 277,444.88 |
| (Line 6 from prior Certificate) | | |
| 8. CURRENT PAYMENT DUE | $ | 34,108.20 |
| 9. BALANCE TO FINISH, INCLUDING RETAINAGE | $ | 1,002,318.92 |
| (Line 1 minus Line 6) | | |

| CHANGE ORDER SUMMARY | ADDITIONS | DEDUCTIONS |
|---|---|---|
| Total changes approved in previous months by Owner | $ | $ |
| Total approved this month | $ | $ |
| TOTAL | $ | $ |
| NET CHANGES by Change Order | $ | |

The undersigned Contractor certifies that to the best of the Contractor's knowledge, information and belief the Work covered by this Application for Payment has been completed in accordance with the Contract Documents, that all amounts have been paid by the Contractor for Work for which previous Certificates for Payment were issued and payments received from the Owner, and that current payment shown herein is now due.

CONTRACTOR    DAN LEPORE & SONS CO.

By: _____ Date: _____

State of PA
County of Montgomery
Subscribed and sworn to before
me this

Notary Public
My commission expires:

## ARCHITECT'S CERTIFICATE FOR PAYMENT

In accordance with the Contract Documents, based on on-site observations and the data comprising this application, the Architect certifies to the Owner that to the best of the Architect's knowledge, information and belief the Work has progressed as indicated, the quality of the Work is in accordance with the Contract Documents, and the Contractor is entitled to payment of the AMOUNT CERTIFIED.

AMOUNT CERTIFIED .............................. $ _____
(Attach explanation if amount certified differs from the amount applied. Initial all figures on this Application and on the Continuation Sheet that are changed to conform with the amount certified.)

ARCHITECT:

By: _____ Date: _____

This Certificate is not negotiable. The AMOUNT CERTIFIED is payable only to the Contractor named herein. Issuance, payment and acceptance of payment are without prejudice to any rights of the Owner or Contractor under this Contract.

CAUTION: You should sign an original AIA Contract Document, on which this text appears in RED. An original assures that changes will not be obscured.

AIA Document G702™ – 1992. Copyright © 1953, 1963, 1965, 1971, 1978, 1983 and 1992 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. Purchasers are permitted to reproduce ten (10) copies of this document when completed. To report copyright violations of AIA Contract Documents, e-mail The American Institute of Architects' legal counsel, copyright@aia.org.

# ▲AIA® Document G703™ – 1992

2    3

## Continuation Sheet

AIA Document G702™– 1992, Application and Certificate for Payment, or G732™-2009,
Application and Certificate for Payment, Construction Manager as Adviser Edition,
containing Contractor's signed certification is attached.
In tabulations below, amounts are in US dollars.
Use Column I on Contracts where variable retainage for line items may apply.

| APPLICATION NO: | *DRAFT* |
| APPLICATION DATE: | 12/19/2025 |
| PERIOD TO: | |
| ARCHITECT'S PROJECT NO: | 25-003 |

| A | B | C | D | E | F | G | % | H | I |
|---|---|---|---|---|---|---|---|---|---|
| | | | WORK COMPLETED | | MATERIALS PRESENTLY STORED (Not in D or E) | TOTAL COMPLETED AND STORED TO DATE (D+E+F) | (G÷C) | BALANCE TO FINISH (C-G) | RETAINAGE (If variable rate) |
| ITEM NO. | DESCRIPTION OF WORK | SCHEDULED VALUE | FROM PREVIOUS APPLICATION (D+E) | THIS PERIOD | | | | | |
| 1 | M1 Repoint Marble 4,405 SF | 123,340.00 | 98,672.00 | 24,668.00 | | 123,340.00 | 100.00 | | 12,334.00 |
| 2 | M7 Buttress Reconstruction 4E | 156,000.00 | | | | | | 156,000.00 | |
| 3 | M8 Finial Reconstruction 4EA | 92,100.00 | | | | | | 92,100.00 | |
| 4 | M9 Trefoil Repair 20EA | 58,000.00 | 55,100.00 | | | 55,100.00 | 95.00 | 2,900.00 | 5,510.00 |
| 5 | M10 Crack Injection 33LF | 5,742.00 | | | | | | 5,742.00 | |
| 6 | M11 Repoint-Brick BU 1,700 S | 37,400.00 | 35,530.00 | 1,870.00 | | 37,400.00 | 100.00 | | 3,740.00 |
| 7 | M12 Brick Replace20SF 120P | 6,840.00 | 6,840.00 | | | 6,840.00 | 100.00 | | 684.00 |
| 8 | M13 Steel Rod 4EA | 5,900.00 | | | | | | 5,900.00 | |
| 9 | R1 Marble Replc Type1-30 rolls | 44,100.00 | 22,050.00 | | | 22,050.00 | 50.00 | 22,050.00 | 2,205.00 |
| 10 | R2 Marble Replc Type2-40 rolls | 68,000.00 | 30,600.00 | 1,700.00 | | 32,300.00 | 47.50 | 35,700.00 | 3,230.00 |
| 11 | R3 Marble Replc Type3-30 rolls | 63,750.00 | 13,706.25 | 1,147.50 | | 14,853.75 | 23.30 | 48,896.25 | 1,485.38 |
| 12 | R4 Marble Replc Type4 5 Each | 15,500.00 | 1,550.00 | | | 1,550.00 | 10.00 | 13,950.00 | 155.00 |
| 13 | R5 Marble Replc Type5-1EA | 2,900.00 | 1,450.00 | | | 1,450.00 | 50.00 | 1,450.00 | 145.00 |
| 14 | G1 WI Grouting void span 300 | 58,500.00 | | | | | | 58,500.00 | |
| 16 | BASE BID DESCRIPTIONS | | | | | | | | |
| 20 | ALLOWANCES | | | | | | | | |
| 22 | A-M1 Repoint Marble 1,610 SF | 45,080.00 | | | | | | 45,080.00 | |
| 23 | A-M2 Marble Patch 150 SF | 18,750.00 | | | | | | 18,750.00 | |
| 24 | A-M3 Marble Dutchman 50 PC | 12,500.00 | | | | | | 12,500.00 | |
| 25 | A-M4A Marble Stab Pinning 75 | 13,125.00 | | 7,875.00 | | 7,875.00 | 60.00 | 5,250.00 | 787.50 |
| 26 | A-M48 Marble PanelPinning 35 | 7,000.00 | | | | | | 7,000.00 | |
| 27 | A-M5 Marble Exfoliat 1,626SF | 40,650.00 | | | | | | 40,650.00 | |
| 28 | A-M6 Marble RI Anchor Rpl 50 | 6,250.00 | | | | | | 6,250.00 | |
| 29 | A-M6A Marble RI Ptchg 100EA | 12,250.00 | | | | | | 12,250.00 | |
| 30 | A-M6B Marble RI Dutchman 25 | 6,250.00 | | | | | | 6,250.00 | |
| | GRAND TOTAL | | | | | | | | |

CAUTION: You should sign an original AIA Contract Document, on which this text appears in RED. An original assures that changes will not be obscured.

AIA Document G703™ – 1992. Copyright © 1963, 1965, 1966, 1967, 1970, 1978, 1983 and 1992 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. Purchasers are permitted to reproduce ten (10) copies of this document when completed. To report copyright violations of AIA Contract Documents, e-mail The American Institute of Architects' legal counsel, copyright@aia.org.

# AIA® Document G703™ – 1992

3    3

## Continuation Sheet

AIA Document G702™ 1992, Application and Certificate for Payment, or G732™ 2009,
Application and Certificate for Payment, Construction Manager as Adviser Edition,
containing Contractor's signed certification is attached.
In tabulations below, amounts are in US dollars.
Use Column I on Contracts where variable retainage for line items may apply.

APPLICATION NO:         *DRAFT*
APPLICATION DATE:       12/19/2025
PERIOD TO:
ARCHITECT'S PROJECT NO: 25-003

| A | B | C | D | E | F | G | H | I |
|---|---|---|---|---|---|---|---|---|
| | | | WORK COMPLETED | | | | | |
| ITEM NO. | DESCRIPTION OF WORK | SCHEDULED VALUE | FROM PREVIOUS APPLICATION (D + E) | THIS PERIOD | MATERIALS PRESENTLY STORED (Not in D or E) | TOTAL COMPLETED AND STORED TO DATE (D+E+F) | % (G ÷ C) | BALANCE TO FINISH (C – G) | RETAINAGE (if variable rate) |
| 31 | A-M10 Crack Injections 157 LF | 27,475.00 | | | | | | 27,475.00 | |
| 32 | A-M11 Repoint Brick BU150SF | 3,750.00 | | 637.50 | | 637.50 | 17.00 | 3,112.50 | 63.75 |
| 33 | A-M12 Brick Replacement 150 | 52,500.00 | 36,225.00 | | | 36,225.00 | 69.00 | 16,275.00 | 3,622.50 |
| 34 | A-M14 Helical Bed Reinf 30EA | 3,750.00 | | | | | | 3,750.00 | |
| 35 | A-R1 Marble Repl Type1-RI 27 | 39,690.00 | 6,548.85 | | | 6,548.85 | 16.50 | 33,141.15 | 654.89 |
| 36 | A-R2Marble Repl Type2RI 31 | 52,700.00 | | | | | | 52,700.00 | |
| 37 | A-R3Marble Repl Type3RI 15E | 31,875.00 | | | | | | 31,875.00 | |
| 38 | A-R4Marble Repl Type4RI 5A | 15,500.00 | | | | | | 15,500.00 | |
| 39 | A-RGMarble Rplype6 Rect 100 | 50,000.00 | | | | | | 50,000.00 | |
| 40 | A-G1 WI Grouting Void Span50 | 9,750.00 | | | | | | 9,750.00 | |
| 41 | A-S1 Armored Jnt Instl 100LF | 6,100.00 | | | | | | 6,100.00 | |
| 42 | CO#1 Marble RI Length Replcr | 69,295.00 | | | | | | 69,295.00 | |
| 43 | CO#2 Marble Partial Dutchmar | 51,560.00 | | | | | | 51,560.00 | |
| | Totals GRAND TOTAL | 1,313,872.00 | 308,272.10 | 37,898.00 | | 346,170.10 | 26.35 | 967,701.90 | 34,617.02 |

**CAUTION: You should sign an original AIA Contract Document, on which this text appears in RED. An original assures that changes will not be obscured.**

AIA Document G703™ – 1992. Copyright © 1963, 1965, 1966, 1967, 1970, 1978, 1983 and 1992 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. Purchasers are permitted to reproduce ten (10) copies of this document when completed. To report copyright violations of AIA Contract Documents, e-mail The American Institute of Architects' legal counsel, copyright@aia.org.

# <u>EXHIBIT F</u>

2/2/26 Email

**rgreenbaum@karalislaw.com**

| | |
|---|---|
| **From:** | Greg Lepore <greglep@danlepore.com> |
| **Sent:** | Friday, January 2, 2026 2:23 PM |
| **To:** | Donald P. Scholz |
| **Cc:** | Sameh A. Majid |
| **Subject:** | RE: Marble Rolls for Arch St. Church |
| **Attachments:** | December SOV (31.0 KB) |
| | |
| **Importance:** | High |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

Don,

First order of business, Lepore must be paid for its October and November requisitions. Absent that, Lepore is unable to move forward unless we are paid $277,359.38.

You will recall that the very lengthy delays to scaffold completion made it so that the project lost its scheduled position for marble roll fabrication. Before I contact the fabricator to see if there is an opportunity for these rolls to be fabricated this winter, we must be assured that the quantities of rolls and roll sizes are definitively reconciled.

As you know, after the scaffolding was completed, CVM began a series of detailed inspections and surveys of scope of work quantities for this project including marble roll quantities. The scope of work quantities was updated and adjusted in CVM field observation reports as the spire elevations were sequentially inspected through the Fall by CVM's engineer. **Given CVM's survey process, please provide a final quantity of rolls at each respective location (i.e., by elevation and course height). Also, please confirm how many rolls of each size CVM wishes to be added to these quantities to cover replacements unforeseen in field observation reports.** We hope that these quantities dovetail with Lepore's (attached) December 24, 2025 email to CVM that contains what Lepore believes, is our approved schedule of values (SOV) especially given, that this SOV, confirms plus and minus adjustments in rolls quantities. **This is why we need to be assured that the quantities of rolls and roll sizes are definitively reconciled.** The SOV also confirms change order requests 1 and 2 which also adjust roll quantities. These change orders must be approved and issued so that these quantities can also be finally reconciled for fabrication.

Given Lepore's Chapter 11 filing, once we come to terms and execute the Amendment to the Johns Hopkins agreement and once this Amendment is approved by the Court, we can focus on such an Amendment for the Church Spire project. However, we will need to reconcile scope of work adjustments, change orders requests #1 and #2 and Lepore will have to price and receive change orders for additional work (e.g., *temporary relocation and storage of buttress stone elements to the sidewalk and **top of spire stone elements removal and or replacements).

- * NOTE! Unless CVM can confirm that the scaffolding can accommodate the load of stored stone materials and unless CVM can confirm that surface area of scaffold decking can accommodate all the buttress stone that's removed for temporary storage.

- ** NOTE! Unless CVM can confirm that the scaffolding can accommodate the load of stored stone materials and unless CVM can confirm that surface area of scaffold decking can accommodate all the top of spire stone that's removed for temporary storage. NOTE! If top of spire stone elements is replaced, then CVM must confirm that hoisting by others will be extended up to the top of the spire for stone that's to be discarded and for new replacement stone elements.

Thank You,
Greg
**Gregory J. Lepore, President**
**(p) 610-940-9888 ext 222**
**(f)  610-834-9226**
**(c) 610-960-5163**

## DAN LEPORE
& SONS COMPANY

501 WASHINGTON STREET - CONSHOHOCKEN, PA 19428
**www.danlepore.com**

---

**From:** Donald P. Scholz <DScholz@cvmnext.com>
**Sent:** Wednesday, December 31, 2025 4:27 PM
**To:** Greg Lepore <greglep@danlepore.com>
**Cc:** Sameh A. Majid <SMajid@cvmnext.com>
**Subject:** Marble Rolls for Arch St. Church
**Importance:** High

Greg,

Please confirm that the marble rolls have been ordered and are in production.  I understand your claim regarding the delays in the scaffolding, but that has nothing to do with production of the rolls at this point.  Lepore has had more than adequate time on the spire, have documented all the rolls that need to be produced, and have no reason to not release these into production.  CVM has been working with you to assist with your financial situation and we have offered to provide payments for deposits if required to ensure the rolls are being produced.  Lastly, Gino, Kevin and I have worked out the adjustments to the schedule of values for the roll scope, and we will issue a change order to Lepore next week with those changes.

Thank you and happy new year

Don


Don Scholz
Project Manager
**CVMNext Construction**
office 610.964.2800 x114
mobile 610.715.4700
cvmnext.com

# **EXHIBIT G**

2/26/26 Email

 Gmail

**Aris Karalis <akaralis@karalislaw.com>**

## Arch Street United Methodist Church - Church Spire Rehabilitation project
1 message

**Greg Lepore** <greglep@danlepore.com>                                      Mon, Jan 26, 2026 at 7:39 PM
To: "Sameh A. Majid" <smajid@cvmnext.com>
Cc: "Donald P. Scholz" <dscholz@cvmnext.com>, Aris Karalis <akaralis@karalislaw.com>, Robert Greenbaum
<rgreenbaum@karalislaw.com>, Tamie Barsky <tamie@danlepore.com>, Greg Lepore Jr <gregjr@danlepore.com>

Sameh,

Both you and Don Scholz communicated to me the Owner's demand for certified payroll reports at the Broad St. and
Arch St. Church Spire project as a requirement to paying Lepore its <u>overdue</u> November and December requisitions.
While neither CVM/Next, nor the Owner, has any right to demand certified payrolls from Lepore, on January 15,
2026, Lepore sent to your firm the certified payroll reports to ensure that CVM/Next had no more excuses to pay
Lepore.  See attached file sent to CVM/Next.

Last week when you called me, I directly asked you whether the Owner had paid CVM/Next to pay Lepore the two
overdue requisitions. I was disappointed that you "could not answer" my question. Therefore, I must ask you again:
did CVM/Next receive Lepore's November and December's requisition payments from the Owner and is it
withholding these funds from Lepore? Lepore is aware that the November 2025 payment application for $102,529.80
was approved by both the Owner and CVM/Next and believes that that December 2025 payment application has
also been approved.  These funds are crucial assets of Lepore's chapter 11 bankruptcy estate, and we are duty
bound to collect these funds for the estate.  Accordingly, I must insist on immediate payment of Lepore's November
and December requisitions.

Please note that our counsel is preparing the requisite turnover action for recovery of the funds due Lepore on
account of the November and December payment applications.  The only question is whether CVM/Next or the
Owner is improperly holding the funds due the Lepore's bankruptcy estate.  Please advise without further delay.

Thank You,

**Gregory J. Lepore, President**

**(p) 610-940-9888 ext 222**

**(f)  610-834-9226**

**(c) 610-960-5163**



501 WASHINGTON STREET - CONSHOHOCKEN, PA 19428

**www.danlepore.com**

**Arch St Church CP.zip**
6368K

# EXHIBIT H

Demand Letter

# KARALIS PC

Attorneys at Law

1900 SPRUCE STREET
PHILADELPHIA, PA  19103-6697
TEL: 215.546.4500
FAX: 215.985.4175
www.karalislaw.com

ARIS J. KARALIS
TEL: 215.546.4500 ext. 104
E-mail: akaralis@karalislaw.com

February 4, 2026

**VIA FEDERAL EXPRESS**
**and E-MAIL smajid@cvmnext.com**

CVMNEXT Construction
Attn: Mr. Sameh Majid
1002 West 9th Avenue
King of Prussia, PA 19406

   Re: **Contractor:** **CVMNEXT Construction**
      **Project:**  **Arch Street United Methodist Church Spire Rehabilitation**

      **Dan Lepore & Sons Company (Bankruptcy No. 25-4757 (AMC))**

Dear Mr. Majid:

   As you are aware, my firm is counsel to Dan Lepore & Sons Company (the "<u>Debtor</u>") in connection with the above-referenced bankruptcy proceeding.  On November 21, 2025 (the "<u>Petition Date</u>"), the Debtor filed a voluntary petition for relief pursuant to Chapter 11 of Title 11 of the United States Code (the "<u>Bankruptcy Code</u>") with the United States Bankruptcy Court for the Eastern District of Pennsylvania.  Since the Petition Date, the Debtor has remained in possession of its assets and is operating as a debtor-in-possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code.

   On or about January 7, 2025, the Debtor, as subcontractor, entered into a subcontract with CVMNEXT Construction, as general contractor ("<u>CVM</u>"), in the amount of $1,193,000.00, as amended by net change orders to the amount of $1,313,872.00 (the "<u>Subcontract</u>"), to furnish labor, materials, equipment, and supervision for the performance of Masonry work as more specifically described the Subcontract (the "<u>Debtor's Work</u>") for the project known as the Arch Street United Methodist Church Spire Rehabilitation (the "<u>Arch Street Spire Project</u>").

   Under the Subcontract, the Debtor has submitted to CVM three monthly payment applications on account of the Debtor's Work completed at the Arch Street Spire Project: (a) Payment Application No. 1 (dated October 29, 2025) for the period ending October 31, 2025 in the amount of $174,915.08 which was approved, (b) Payment Application No. 2 (dated November 24, 2025) for the period ending November 30, 2025 in the amount of $102,529.80 which was approved, and (c) Payment Application No. 3 (marked DRAFT) for the period ending December

CVMNEXT Construction
Attn: Mr. Sameh Majid
February 3, 2026
Page 2

31, 2025 in the amount of $34,108.20 which was pending approval.

To date, CVM has only remitted the sums due the Debtor for Payment Application No. 1. However, despite the Debtor's prior demand for the additional sums due pursuant to Payment Applications Nos. 2 and 3 aggregating $136,638.00 (collectively, the "Unpaid Obligations"), CVM has failed to pay the Unpaid Obligations to the Debtor.

Upon information and belief, the owner of the Arch Street Spire Project has: (a) paid to CVM the amount of $102,529.80 on account of approved Payment Application No. 2 (dated November 24, 2025), but CVM is withholding turnover/payment of these monies due the Debtor, (b) approved Payment Application No. 3, and (c) paid to CVM the amount of $34,108.20 on account of Payment Application No. 3, but CVM is withholding turnover/payment of these monies due the Debtor.

Please be advised that the Unpaid Obligations are property of the Debtor's estate pursuant to 11 U.S.C. § 541 and subject to turnover pursuant to 11 U.S.C. § 542.  For ease of reference, copies of Payment Applications No. 2 and No.3 are attached and made a part hereof.

Please issue, immediately, a check made payable to "**Dan Lepore & Sons Company**" for the amount of the Unpaid Obligations ($136,638.00) and advise the undersigned when this check is available to be picked up at your offices by a representative of the Debtor.

Please note that this demand is without prejudice to its modification upon further review of, *inter alia*, CVM's action and/or inaction with respect to the within demand.  If the Unpaid Obligations are not paid within ten (10) days of the date of this correspondence, you will leave the Debtor with no alternative but to file a complaint against CVM in the Bankruptcy Court for the amount demanded herein, plus the legal fees and costs incurred in prosecuting such action.

The Debtor hereby reserves any and all rights in connection with the collection of the amount demanded herein and any additional amounts that are due or that may come due from CVM that are not specified herein.

Thank you for your anticipated cooperation in this matter.  Please be guided accordingly.

Very truly yours,

*Aris J. Karalis*

ARIS J. KARALIS

AJK/jh
Enclosures
cc:    Donald P. Scholz (via e-mail only w/enclosures)
       Tamie Barsky (via e-mail only w/enclosures)
       Greg Lepore (via e-mail only w/ enclosures)
       Robert M. Greenbaum, Esquire (via e-mail only w/ enclosures)

 **AIA** Document G702™ – 1992

## Application and Certificate for Payment

| | | | |
|---|---|---|---|
| TO OWNER: | CVM Next Construction<br>1002 West 9th Avenue<br>King of Prussia, PA 19406 | PROJECT: | Arch St. United Methodist |

| | |
|---|---|
| FROM CONTRACTOR: | DAN LEPORE & SONS CO. VIA ARCHITECT:<br>501 WASHINGTON STREET, STE.<br>CONSHOHOCKEN, PA 19428 |

| | |
|---|---|
| APPLICATION NO: | 2 |
| PERIOD TO: | 11-30-2025 |
| CONTRACT FOR: | |
| CONTRACT DATE: | |
| PROJECT NOS. | 25-003 / |

Distribution to:
OWNER [ ]
ARCHITECT [ ]
CONTRACTOR [ ]
FIELD [ ]
OTHER [ ]

### CONTRACTOR'S APPLICATION FOR PAYMENT

Application is made for payment, as shown below, in connection with the Contract.
AIA Document G703™, Continuation Sheet, is attached.

| | | |
|---|---|---|
| 1. ORIGINAL CONTRACT SUM ............................ | $ | 1,193,017.00 |
| 2. NET CHANGE BY CHANGE ORDERS ..................... | $ | 0.00 |
| 3. CONTRACT SUM TO DATE (Line 1 + 2) ................ | $ | 1,193,017.00 |
| 4. TOTAL COMPLETED & STORED TO DATE (Column G on G703) | $ | 308,272.10 |
| 5. RETAINAGE: | | |
| a. _10_% on Completed Work<br>(Columns D + E on G703) | $ | 30,827.22 |
| b. ____% of Stored Material<br>(Column F on G703) | $ | |
| Total Retainage (Lines 5a + 5b, or Total in Column I of G703) | $ | 30,827.22 |
| 6. TOTAL EARNED LESS RETAINAGE ..................... | $ | 277,444.88 |
| (Line 4 minus Line 5 Total) | | |
| 7. LESS PREVIOUS CERTIFICATES FOR PAYMENT ......... | $ | 174,915.08 |
| (Line 6 from prior Certificate) | | |
| 8. CURRENT PAYMENT DUE ............................. | $ | 102,529.80 |
| 9. BALANCE TO FINISH, INCLUDING RETAINAGE | $ | 915,572.12 |
| (Line 3 minus Line 6) | | |

| CHANGE ORDER SUMMARY | ADDITIONS | DEDUCTIONS |
|---|---|---|
| Total changes approved in previous months by Owner | $ | $ |
| Total approved this month | $ | $ |
| TOTAL | $ | $ |
| NET CHANGES by Change Order | | |

The undersigned Contractor certifies that to the best of the Contractor's knowledge, information and belief the Work covered by this Application for Payment has been completed in accordance with the Contract Documents, that all amounts have been paid by the Contractor for Work for which previous Certificates for Payment were issued and payments received from the Owner, and that current payment shown herein is now due.

CONTRACTOR: DAN LEPORE & SONS CO.

By: _Dan Forselli_    Date: 11-24-25

State of: PA
County of: Montgomery
Subscribed and sworn to before me this 24th Nov 25'

Notary Public: _Marjorie A Houser_
My commission expires: 8-8-29

Commonwealth of Pennsylvania - Notary Seal
MARJORIE A HOUSER - Notary Public
Montgomery County
My Commission Expires August 8, 2029
Commission Number 1278333

### ARCHITECT'S CERTIFICATE FOR PAYMENT

In accordance with the Contract Documents, based on on-site observations and the data comprising this application, the Architect certifies to the Owner that to the best of the Architect's knowledge, information and belief the Work has progressed as indicated, the quality of the Work is in accordance with the Contract Documents, and the Contractor is entitled to payment of the AMOUNT CERTIFIED.

AMOUNT CERTIFIED ................................. $ _____
(Attach explanation if amount certified differs from the amount applied. Initial all figures on this Application and on the Continuation Sheet that are changed to conform with the amount certified.)

ARCHITECT:

By: _____    Date: _____

This Certificate is not negotiable. The AMOUNT CERTIFIED is payable only to the Contractor named herein. Issuance, payment and acceptance of payment are without prejudice to any rights of the Owner or Contractor under this Contract.

CAUTION: You should sign an original AIA Contract Document, on which this text appears in RED. An original assures that changes will not be obscured.

AIA Document G702™ – 1992. Copyright © 1953, 1963, 1965, 1971, 1978, 1983 and 1992 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. Purchasers are permitted to reproduce ten (10) copies of this document when completed. To report copyright violations of AIA Contract Documents, e-mail The American Institute of Architects' legal counsel, copyright@aia.org.



# AIA® Document G703™ – 1992

## Continuation Sheet

AIA Document G702™-1992, Application and Certificate for Payment, or G732™-2009,
Application and Certificate for Payment, Construction Manager as Adviser Edition,
containing Contractor's signed certification is attached.
In tabulations below, amounts are in US dollars.
Use Column 1 on Contracts where variable retainage for line items may apply.

| APPLICATION NO: | 2 |
|---|---|
| APPLICATION DATE: | 11/24/2025 |
| PERIOD TO: | |
| ARCHITECT'S PROJECT NO: | 25-003 |

| A | B | C | D (From Previous Application) | E (This Period) | F Materials Presently Stored (Not in D or E) | G Total Completed and Stored to Date (D+E+F) | % (G÷C) | H Balance to Finish (C−G) | I Retainage (If variable rate) |
|---|---|---|---|---|---|---|---|---|---|
| ITEM NO. | DESCRIPTION OF WORK | SCHEDULED VALUE | WORK COMPLETED | WORK COMPLETED | | | | | |
| 1 | M1 Repoint Marble 4,405 SF | 123,340.00 | 61,670.00 | 37,002.00 | | 98,672.00 | 80.00 | 24,668.00 | 9,867.20 |
| 2 | M7 Buttress Reconstruction 4E | 156,000.00 | | | | | | 156,000.00 | |
| 3 | M8 Finial Reconstruction 4EA | 92,000.00 | | | | | | 92,100.00 | |
| 4 | M9 Trefoil Repair 20EA | 58,000.00 | | 55,100.00 | | 55,100.00 | 95.00 | 2,900.00 | 5,510.00 |
| 5 | M10 Crack Injection 33LF | 5,742.00 | | | | | | 5,742.00 | |
| 6 | M11 Repoint-Brick BU 1,700 SI | 37,400.00 | 33,680.00 | 1,870.00 | | 35,530.00 | 95.00 | 1,870.00 | 3,553.00 |
| 7 | M12 Brick Replace20SF 120P( | 6,840.00 | 6,840.00 | | | 6,840.00 | 100.00 | | 684.00 |
| 8 | M13 Steel Rod 4EA | 5,900.00 | | | | | | 5,900.00 | |
| 9 | R1 Marble Replc Type1-30 rolls | 44,100.00 | 22,050.00 | | | 22,050.00 | 50.00 | 22,050.00 | 2,205.00 |
| 10 | R2 Marble Replc Type2-40 rolls | 68,000.00 | 30,600.00 | | | 30,600.00 | 45.00 | 37,400.00 | 3,060.00 |
| 11 | R3 Marble Replc Type3-30 rolls | 63,750.00 | 13,706.25 | | | 13,706.25 | 21.50 | 50,043.75 | 1,370.63 |
| 12 | R4 Marble Replc Type4 5 Each | 15,500.00 | 1,550.00 | | | 1,550.00 | 10.00 | 13,950.00 | 155.00 |
| 13 | R5 Marble Replc Type5-1EA | 2,900.00 | 1,450.00 | | | 1,450.00 | 50.00 | 1,450.00 | 145.00 |
| 14 | G1 WI Grouting void span 300S | 58,500.00 | | | | | | 58,500.00 | |
| 16 | BASE BID DESCRIPTIONS | | | | | | | | |
| 20 | ALLOWANCES | | | | | | | | |
| 22 | A-M1 Repoint Marble 1,610 SF | 45,080.00 | | | | | | 45,080.00 | |
| 23 | A-M2 Marble Patch 150 SF | 18,750.00 | | | | | | 18,750.00 | |
| 24 | A-M3 Marble Dutchman 50 PC | 12,500.00 | | | | | | 12,500.00 | |
| 25 | A-M4A Marble Stab Pinning 75 | 13,125.00 | | | | | | 13,125.00 | |
| 26 | A-M4B Marble PanelPinning 35 | 7,000.00 | | | | | | 7,000.00 | |
| 27 | A-M5 Marble Exfoliat 1,626SF | 40,650.00 | | | | | | 40,850.00 | |
| 28 | A-M6 Marble RI Anchor Rpl 50I | 6,250.00 | | | | | | 6,250.00 | |
| 29 | A-M6A Marble RI Ptchg 100EA | 12,250.00 | | | | | | 12,250.00 | |
| 30 | A-M6B Marble RI Dutchman 25 | 6,250.00 | | | | | | 6,250.00 | |
| | GRAND TOTAL | | | | | | | | |

CAUTION: You should sign an original AIA Contract Document, on which this text appears in RED. An original assures that changes will not be obscured.

AIA Document G703™ – 1992. Copyright © 1963, 1965, 1966, 1967, 1970, 1978, 1983 and 1992 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. Purchasers are permitted to reproduce ten (10) copies of this document when completed. To report copyright violations of AIA Contract Documents, e-mail The American Institute of Architects' legal counsel, copyright@aia.org.

 **AIA**® Document G703™ – 1992

## Continuation Sheet

AIA Document G703™–1992, Application and Certificate for Payment, or G732™–2009,
Application and Certificate for Payment, Construction Manager as Adviser Edition,
containing Contractor's signed certification is attached.
In tabulations below, amounts are in US dollars.
Use Column I on Contracts where variable retainage for line items may apply.

APPLICATION NO: 2
APPLICATION DATE: 11/24/2025
PERIOD TO:
ARCHITECT'S PROJECT NO: 25-003

| A | B | C | D | E | F | G | % | H | I |
|---|---|---|---|---|---|---|---|---|---|
| | | | WORK COMPLETED | | MATERIALS PRESENTLY STORED (Not in D or E) | TOTAL COMPLETED AND STORED TO DATE (D+E+F) | | BALANCE TO FINISH (C - G) | RETAINAGE (If variable rate) |
| ITEM NO. | DESCRIPTION OF WORK | SCHEDULED VALUE | FROM PREVIOUS APPLICATION (D + E) | THIS PERIOD | | | (G ÷ C) | | |
| 31 | A-M10 Crack Injections 157 LF | 27,475.00 | | | | | | 27,475.00 | |
| 32 | A-M11 Repoint Brick BU150SF | 3,750.00 | | | | | | 3,750.00 | |
| 33 | A-M12 Brick Replacement 150 | 52,500.00 | 16,275.00 | 19,950.00 | | 36,225.00 | 69.00 | 16,275.00 | 3,622.50 |
| 34 | A-M14 Helical Bed Reinf 30EA | 3,750.00 | | | | | | 3,750.00 | |
| 35 | A-R1 Marble Repl Type1-RI 27 | 39,690.00 | 6,548.85 | | | 6,548.85 | 16.50 | 33,141.15 | 654.89 |
| 36 | A-R2Marble Repl Type2RI 31 | 52,700.00 | | | | | | 52,700.00 | |
| 37 | A-R3Marble Repl Type3RI 15E | 31,875.00 | | | | | | 31,875.00 | |
| 38 | A-R4Marble Repl Type4RI 5A | 15,500.00 | | | | | | 15,500.00 | |
| 39 | A-RGMarble Rpltype6 Rect 10C | 50,000.00 | | | | | | 50,000.00 | |
| 40 | A-G1 WI Grouting Void Span5C | 9,750.00 | | | | | | 9,750.00 | |
| 41 | A-S1 Armored Jnt Instl 100LF | 6,100.00 | | | | | | 6,100.00 | |
| | GRAND TOTAL | 1,193,017.00 | 194,350.10 | 113,922.00 | | 308,272.10 | 25.84 | 884,744.90 | 30,827.22 |

**CAUTION:** You should sign an original AIA Contract Document, on which this text appears in RED. An original assures that changes will not be obscured.

AIA Document G703™ – 1992. Copyright © 1963, 1965, 1966, 1967, 1970, 1978, 1983 and 1992 by The American Institute of Architects. All rights reserved. WARNING: This AIA™ Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA™ Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. Purchasers are permitted to reproduce ten (10) copies of this document when completed. To report copyright violations of AIA Contract Documents, e-mail The American Institute of Architects' legal counsel, copyright@aia.org.

# AIA® Document G702™ – 1992

## Application and Certificate for Payment

| | | |
|---|---|---|
| TO OWNER: | CVM Next Construction | PROJECT: Arch St. United Methodist |
| | 1002 West 9th Avenue | |
| | King of Prussia, PA 19406 | |

| | |
|---|---|
| FROM CONTRACTOR: | DAN LEPORE & SONS CO. VIA ARCHITECT: |
| | 501 WASHINGTON STREET, STE. |
| | CONSHOHOCKEN, PA 19428 |

APPLICATION NO: *DRAFT*
PERIOD TO: 12-31-2025
CONTRACT FOR:
CONTRACT DATE:
PROJECT NOS: 25-003

Distribution to:
OWNER ☐
ARCHITECT ☐
CONTRACTOR ☐
FIELD ☐
OTHER ☐

## CONTRACTOR'S APPLICATION FOR PAYMENT

Application is made for payment, as shown below, in connection with the Contract.
AIA Document G703™, Continuation Sheet, is attached.

| | | |
|---|---|---|
| 1. ORIGINAL CONTRACT SUM | $ | 1,193,017.00 |
| 2. NET CHANGE BY CHANGE ORDERS | $ | 120,855.00 |
| 3. CONTRACT SUM TO DATE (Line 1 ± 2) | $ | 1,313,872.00 |
| 4. TOTAL COMPLETED & STORED TO DATE (Column G on G703) | $ | 346,170.10 |

5. RETAINAGE:
a. 10 % Completed Work (Columns D + E on G703) $ 34,617.02
b. % of Stored Material (Column F on G703) $

Total Retainage (Lines 5a + 5b, or Total in Column I of G703) $ 34,617.02

| | | |
|---|---|---|
| 6. TOTAL EARNED LESS RETAINAGE | $ | 311,553.08 |
| (Line 4 minus Line 5 Total) | | |
| 7. LESS PREVIOUS CERTIFICATES FOR PAYMENT | $ | 277,444.88 |
| (Line 6 from prior Certificate) | | |
| 8. CURRENT PAYMENT DUE | $ | 34,108.20 |
| 9. BALANCE TO FINISH, INCLUDING RETAINAGE | $ | 1,002,318.92 |
| (Line 3 minus Line 6) | | |

| CHANGE ORDER SUMMARY | ADDITIONS | DEDUCTIONS |
|---|---|---|
| Total changes approved in previous months by Owner | $ | $ |
| Total approved this month | $ | $ |
| TOTAL | $ | $ |
| NET CHANGES by Change Order | $ | |

The undersigned Contractor certifies that to the best of the Contractor's knowledge, information and belief the Work covered by this Application for Payment has been completed in accordance with the Contract Documents, that all amounts have been paid by the Contractor for Work for which previous Certificates for Payment were issued and payments received from the Owner, and that current payment shown herein is now due.

CONTRACTOR: DAN LEPORE & SONS CO.

By: _____ Date: _____

State of PA
County of Montgomery
Subscribed and sworn to before me this

Notary Public: _____
My commission expires:

## ARCHITECT'S CERTIFICATE FOR PAYMENT

In accordance with the Contract Documents, based on on-site observations and the data comprising this application, the Architect certifies to the Owner that to the best of the Architect's knowledge, information and belief the Work has progressed as indicated, the quality of the Work is in accordance with the Contract Documents, and the Contractor is entitled to payment of the AMOUNT CERTIFIED.

AMOUNT CERTIFIED $ _____
(Attach explanation if amount certified differs from the amount applied. Initial all figures on this Application and on the Continuation Sheet that are changed to conform with the amount certified.)

ARCHITECT:

By: _____ Date: _____

This Certificate is not negotiable. The AMOUNT CERTIFIED is payable only to the Contractor named herein. Issuance, payment and acceptance of payment are without prejudice to any rights of the Owner or Contractor under this Contract.

CAUTION: You should sign an original AIA Contract Document, on which this text appears in RED. An original assures that changes will not be obscured.

AIA Document G702™ – 1992. Copyright © 1953, 1963, 1965, 1971, 1978, 1983 and 1992 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. Purchasers are permitted to reproduce ten (10) copies of this document when completed. To report copyright violations of AIA Contract Documents, e-mail The American Institute of Architects' legal counsel, copyright@aia.org.



# AIA® Document G703™ – 1992

2    3

## Continuation Sheet

AIA Document G702™– 1992, Application and Certificate for Payment, or G732™ 2009,
Application and Certificate for Payment, Construction Manager as Adviser Edition,
containing Contractor's signed certification is attached.
In tabulations below, amounts are in US dollars.
Use Column I on Contracts where variable retainage for line items may apply.

| APPLICATION NO: | *DRAFT* |
|---|---|
| APPLICATION DATE: | 12/19/2025 |
| PERIOD TO: | |
| ARCHITECT'S PROJECT NO: | 25-003 |

| A | B | C | D | E | F | G | % | H | I |
|---|---|---|---|---|---|---|---|---|---|
| | | | WORK COMPLETED | | MATERIALS PRESENTLY STORED (Not in D or E) | TOTAL COMPLETED AND STORED TO DATE (D+E+F) | (G÷C) | BALANCE TO FINISH (C−G) | RETAINAGE (If variable rate) |
| ITEM NO. | DESCRIPTION OF WORK | SCHEDULED VALUE | FROM PREVIOUS APPLICATION (D+E) | THIS PERIOD | | | | | |
| 1 | M1 Repoint Marble 4,405 SF | 123,340.00 | 98,672.00 | 24,668.00 | | 123,340.00 | 100.00 | | 12,334.00 |
| 2 | M7 Buttress Reconstruction 4E | 156,000.00 | | | | | | 156,000.00 | |
| 3 | M8 Finial Reconstruction 4EA | 92,100.00 | | | | | | 92,100.00 | |
| 4 | M9 Trefoil Repair 20EA | 58,000.00 | 55,100.00 | | | 55,100.00 | 95.00 | 2,900.00 | 5,510.00 |
| 5 | M10 Crack Injection 33LF | 5,742.00 | | | | | | 5,742.00 | |
| 6 | M11 Repoint-Brick BU 1,700 S | 37,400.00 | 35,530.00 | 1,870.00 | | 37,400.00 | 100.00 | | 3,740.00 |
| 7 | M12 Brick Replace20SF 120P | 6,840.00 | 6,840.00 | | | 6,840.00 | 100.00 | | 684.00 |
| 8 | M13 Steel Rod 4EA | 5,900.00 | | | | | | 5,900.00 | |
| 9 | R1 Marble Replc Type1-30 rolls | 44,100.00 | 22,050.00 | | | 22,050.00 | 50.00 | 22,050.00 | 2,205.00 |
| 10 | R2 Marble Replc Type2-40 rolls | 68,000.00 | 30,600.00 | 1,700.00 | | 32,300.00 | 47.50 | 35,700.00 | 3,230.00 |
| 11 | R3 Marble Replc Type3-30 rolls | 63,750.00 | 13,706.25 | 1,147.50 | | 14,853.75 | 23.30 | 48,896.25 | 1,485.38 |
| 12 | R4 Marble Replc Type4 5 Each | 15,500.00 | 1,550.00 | | | 1,550.00 | 10.00 | 13,950.00 | 155.00 |
| 13 | R5 Marble Replc Type5-1EA | 2,900.00 | 1,450.00 | | | 1,450.00 | 50.00 | 1,450.00 | 145.00 |
| 14 | G1 WI Grouting void span 300 | 58,500.00 | | | | | | 58,500.00 | |
| 16 | BASE BID DESCRIPTIONS | | | | | | | | |
| 20 | ALLOWANCES | | | | | | | | |
| 22 | A-M1 Repoint Marble 1,610 SF | 45,080.00 | | | | | | 45,080.00 | |
| 23 | A-M2 Marble Patch 150 SF | 18,750.00 | | | | | | 18,750.00 | |
| 24 | A-M3 Marble Dutchman 50 PC | 12,500.00 | | | | | | 12,500.00 | |
| 25 | A-M4A Marble Stab Pinning 75 | 13,125.00 | | 7,875.00 | | 7,875.00 | 60.00 | 5,250.00 | 787.50 |
| 26 | A-M48 Marble PanelPinning 35 | 7,000.00 | | | | | | 7,000.00 | |
| 27 | A-M5 Marble Exfoliat 1,626SF | 40,650.00 | | | | | | 40,650.00 | |
| 28 | A-M6 Marble RI Anchor Rpl 50 | 6,250.00 | | | | | | 6,250.00 | |
| 29 | A-M6A Marble RI Ptchg 100EA | 12,250.00 | | | | | | 12,250.00 | |
| 30 | A-M6B Marble RI Dutchman 25 | 6,250.00 | | | | | | 6,250.00 | |
| | GRAND TOTAL | | | | | | | | |

CAUTION: You should sign an original AIA Contract Document, on which this text appears in RED. An original assures that changes will not be obscured.

AIA Document G703™ – 1992. Copyright © 1963, 1965, 1966, 1967, 1970, 1978, 1983 and 1992 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. Purchasers are permitted to reproduce ten (10) copies of this document when completed. To report copyright violations of AIA Contract Documents, e-mail The American Institute of Architects' legal counsel, copyright@aia.org.

# AIA Document G703™ – 1992

3   3

## Continuation Sheet

AIA Document G702™-1992, Application and Certificate for Payment, or G732™-2009,
Application and Certificate for Payment, Construction Manager as Adviser Edition,
containing Contractor's signed certification is attached.
In tabulations below, amounts are in US dollars.
Use Column I on Contracts where variable retainage for line items may apply.

| APPLICATION NO: | *DRAFT* |
| APPLICATION DATE: | 12/19/2025 |
| PERIOD TO: | |
| ARCHITECT'S PROJECT NO: | 25-003 |

| A | B | C | D | E | F | G | H | I |
|---|---|---|---|---|---|---|---|---|
| | | | WORK COMPLETED | | | | | |
| ITEM NO. | DESCRIPTION OF WORK | SCHEDULED VALUE | FROM PREVIOUS APPLICATION (D + E) | THIS PERIOD | MATERIALS PRESENTLY STORED (Not in D or E) | TOTAL COMPLETED AND STORED TO DATE (D+E+F) | % (G ÷ C) | BALANCE TO FINISH (C – G) | RETAINAGE (if variable rate) |
| 31 | A-M10 Crack Injections 157 LF | 27,475.00 | | | | | | 27,475.00 | |
| 32 | A-M11 Repoint Brick BU150SF | 3,750.00 | | 637.50 | | 637.50 | 17.00 | 3,112.50 | 63.75 |
| 33 | A-M12 Brick Replacement 150 | 52,500.00 | 36,225.00 | | | 36,225.00 | 69.00 | 16,275.00 | 3,622.50 |
| 34 | A-M14 Helical Bed Reinf 30EA | 3,750.00 | | | | | | 3,750.00 | |
| 35 | A-R1 Marble Repl Type1-RI 27 | 39,690.00 | 6,548.85 | | | 6,548.85 | 16.50 | 33,141.15 | 654.89 |
| 36 | A-R2Marble Repl Type2RI 31 | 52,700.00 | | | | | | 52,700.00 | |
| 37 | A-R3Marble Repl Type3RI 15E | 31,875.00 | | | | | | 31,875.00 | |
| 38 | A-R4Marble Repl Type4RI 5A | 15,500.00 | | | | | | 15,500.00 | |
| 39 | A-RGMarble Rplype6 Rect 100 | 50,000.00 | | | | | | 50,000.00 | |
| 40 | A-G1 WI Grouting Void Span5C | 9,750.00 | | | | | | 9,750.00 | |
| 41 | A-S1 Armored Jnt Instl 100LF | 6,100.00 | | | | | | 6,100.00 | |
| 42 | CO#1 Marble RI Length Replcr | 69,295.00 | | | | | | 69,295.00 | |
| 43 | CO#2 Marble Partial Dutchmar | 51,560.00 | | | | | | 51,560.00 | |
| | Totals GRAND TOTAL | 1,313,872.00 | 308,272.10 | 37,898.00 | | 346,170.10 | 26.35 | 967,701.90 | 34,617.02 |

**CAUTION: You should sign an original AIA Contract Document, on which this text appears in RED. An original assures that changes will not be obscured.**

AIA Document G703™ – 1992. Copyright © 1963, 1965, 1966, 1967, 1970, 1978, 1983 and 1992 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. Purchasers are permitted to reproduce ten (10) copies of this document when completed. To report copyright violations of AIA Contract Documents, e-mail The American Institute of Architects' legal counsel, copyright@aia.org.

# **<u>EXHIBIT I</u>**

Lepore Declaration

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| In re: | : | **Chapter 11** |
| | : | |
| **DAN LEPORE & SONS COMPANY,**[1] | : | **Case No. 25-14757 (AMC)** |
| | : | |
| Debtor. | : | |
| | : | |
| **DAN LEPORE & SONS COMPANY,** | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | **ADVERSARY NO. 26-** |
| | : | |
| **CVM CONSTRUCTION** | : | |
| **MANAGERS, INC.  D/B/A** | : | |
| **CVMNEXT CONSTRUCTION,** | : | |
| | : | |
| Defendant. | : | |

**DECLARATION OF GREGORY J. LEPORE
IN SUPPORT OF COMPLAINT OF DEBTOR TO
COMPEL TURNOVER OF ESTATE PROPERTY PURSUANT
TO 11 U.S.C. §§ 541 AND 542 AND FOR OTHER RELATED RELIEF**

The undersigned hereby swears and affirms pursuant to 28 U.S.C. § 1746 that the following information is true and correct to the best of my knowledge, information and belief:

1.      I am the president, director and fifty (50%) shareholder of Dan Lepore & Sons Company (the "Debtor").

2.      On March 6, 2026, I authorized the Debtor to file the Complaint of Debtor to Compel Turnover of Estate Property Pursuant to 11 U.S.C. §§ 541 and 542 and for other Related Relief (the "Complaint").

---

[1] The last four digits of the Debtor's federal tax identification number are (3562). The Debtor has an address at 501 Washington Street, Conshohocken, PA 19428.

3.      I reviewed the Complaint prior its filing with the Court.

4.      All of the facts and averments set forth in the Complaint are true and correct and I

offer these facts and averments in support of the relief sought in the Complaint.

5.      I declare under penalty of perjury that the foregoing is true and correct.


                                        /s/ *Gregory J. Lepore*_____ _____
                                        Gregory J. Lepore, President
                                        Dan Lepore & Sons Company

Dated: March 6, 2026